

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*26 Federal Plaza*
*New York, New York 10278*

December 10, 2024

**BY ECF/EMAIL**
Honorable Mary K. Vyskocil
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

  Re: *United States v. Maximilien de Hoop Cartier*, 24 Cr. 133 (MKV)

Dear Judge Vyskocil:

  The Government respectfully submits this letter outlining its position on bail. As set forth below, the defendant Maximilien de Hoop CARTIER is charged with being a key member of a money laundering network that moved hundreds of millions of dollars in cryptocurrency, representing the proceeds of drug trafficking and bank fraud, to Colombia, among other countries. Given CARTIER's extensive ties to foreign countries, corresponding lack of meaningful ties to the United States, including the Southern District of New York (where this case will be tried), access to significant resources, and blatant disregard for U.S. authorities, there is no combination of conditions that would address CARTIER's extreme risk of flight. Accordingly, detention is warranted.

  **I.** **PROCEDURAL BACKGROUND**

  On February 20, 2024, a five-count criminal complaint was filed in the Southern District of New York charging CARTIER with (1) conspiracy to commit money laundering; (2) money laundering; (3) bank fraud; (4) operating an unlicensed money transmitting business; and (5) engaging in a monetary transaction in property derived from specified unlawful activity.

  On or about February 22, 2024, CARTIER was arrested in Miami, Florida. At the time, CARTIER was not living in the United States and was merely transiting through Florida. On or about February 23, 2024, CARTIER was presented before Judge Goodman in the Southern District of Florida. Pretrial Services for the Southern District of Florida interviewed CARTIER and, in its Pretrial Services Report, recommended that there were no conditions that could reasonably assure the defendant's appearance in court. Pretrial Services noted that the defendant posed a risk of nonappearance for the following reasons, among other reasons: CARTIER is a citizen of Argentina, resides in France, has never lived in the United States, has ties to Costa Rica and family ties to Argentina, and he has no family ties to the United States. Judge Goodman temporarily detained CARTIER and set a pretrial detention and removal hearing for February 28, 2024, which

was then rescheduled for March 4, 2024. At that hearing before Judge Reid in the Southern District of Florida, the defendant consented to detention and waived his removal hearing.

On March 7, 2024, a Grand Jury sitting in the Southern District of New York returned a six-count superseding indictment charging CARTIER and five other defendants. The Superseding Indictment charged CARTIER with (1) conspiracy to commit money laundering; (2) money laundering; (3) bank fraud; (4) operating an unlicensed money transmitting business; and (5) engaging in a monetary transaction in property derived from specified unlawful activity.

On May 22, 2024, CARTIER made his initial appearance in this District before Judge Willis and CARTIER was detained on consent without prejudice.

II. **FACTUAL BACKGROUND**

From at least in or about January 2020 up to the time of his arrest, Maximilien de Hoop CARTIER, an Argentinian citizen, held a key role in a largescale money laundering network (the "Network") that utilized the U.S. financial system to, among other things, launder substantial sums of criminal proceeds, including the proceeds of drug trafficking and bank fraud, to Colombia, among other countries.

As described more fully in the Complaint (Dkt. No. 1), CARTIER's role in the Network is to maintain, operate, and/or control multiple U.S.-based shell companies (the "Cartier Companies") and U.S.-based bank accounts (the "Cartier Accounts") on behalf of the Cartier Companies. Using this system of shell companies and bank accounts, CARTIER operates an unlicensed money remitting business to convert cryptocurrency (representing the proceeds of illicit activity) into fiat currency, which CARTIER then wires to companies in Colombia and elsewhere pursuant to fake technology and software services contracts designed to conceal the true nature of the funds. To maintain the Cartier Accounts, CARTIER has made numerous false representations to U.S. regulators, banks, and others about the Cartier Companies, including, among other things, that the Cartier Companies were in the business of software, hardware, artificial intelligence, virtual reality, data processing, and/or digital technology solutions. In particular, CARTIER perpetrated these falsehoods on (i) forms submitted to the Internal Revenue Service; (ii) company registration documents; and/or (iii) account opening application materials submitted to numerous banks. CARTIER has also submitted falsified bank statements to a Cartier Account bank to upgrade that account in furtherance of his activities with the Network. As CARTIER explained to an undercover agent with the Federal Bureau of Investigation ("FBI") ("UC-1"), he lies about the nature of business for the Cartier Companies because he knows banks will deny transfers or close his accounts if the banks knew what CARTIER was truly doing—*i.e.*, operating an over-the-counter cryptocurrency exchange designed to move crime proceeds in a manner that conceals their illicit origins.

CARTIER continued to operate his unlicensed money remitting business despite agents with the Drug Enforcement Administration ("DEA") seizing bank accounts for three of the Cartier Companies in or about April 2021. These accounts were seized because they received more than $900,000 U.S. dollars in total in suspected drug proceeds from an undercover DEA account.

Undeterred by these seizures, CARTIER partnered with at least four other members of the Network (referred to as the "Cartier Cell" in the Complaint), who are all Colombian citizens.

Between at least in or about May 2023 and in or about November 2023, the Cartier Cell laundered the proceeds of drug trafficking to Colombia through the U.S. financial system. In particular, CARTIER worked with two providers of cryptocurrency (his co-defendants Leonardo de Jesus Zulaga Duque ("Zuluaga") and Erica Milena Lopez Ortiz ("Lopez")) and two individuals ("CC-1" and co-defendant Felipe Estrada Echeverry ("Estrada")) who were associated with the Colombian companies that received dozens of U.S. dollar wires from CARTIER. During this time, a confidential source for the FBI ("CS-1"), at the direction of law enforcement, facilitated the movement of approximately $14.5 million Tether (a form of cryptocurrency tied to the value of the U.S. dollar) from Zuluaga and Lopez to CARTIER over the course of approximately 62 movements. For the most part, CARTIER instructed CS-1 to transfer the Tether to particular cryptocurrency wallets controlled by certain cryptocurrency exchanges. CARTIER then received a deposit in U.S. dollars from these cryptocurrency exchanges into an account for one of his shell companies, Bullpix Solutions LLC ("Bullpix"). CARTIER then used Bullpix to wire approximately $14.4 million U.S. dollars (across multiple transactions) to certain companies that Estrada or CC-1 were associated with. For his part, CARTIER received a commission of at least approximately 0.5% for each transfer.

It is clear that the funds that CARTIER and the Cartier Cell moved to Colombia were drug trafficking proceeds. For example, in a recorded meeting with CS-1, Zuluaga explained his business to CS-1: "it's not like I bring the drugs, sell the drugs and collect the money to go down to buy Tether, no." Rather, Zuluaga knows that "[t]here are people who do that" and he just buys the Tether. In other words, Zuluaga buys Tether that represents the proceeds of drug trafficking, which he then launders through the Cartier Cell with the help of CARTIER. As another example, in a separate conversation between CS-1 and Lopez, Lopez acknowledged that the money comes from drug trafficking. As a final example, in or about November 2023, at the direction of law enforcement, CS-1 facilitated a controlled purchase of approximately 9 kilograms of cocaine paste[1] from Lopez and her husband/partner, co-defendant Alexander Egidio Areiza Ceballos. Lopez directed payment for the cocaine paste to a particular cryptocurrency wallet, which Zuluaga and Lopez had previously used to send Tether to CS-1 for purposes of laundering money through the Cartier Cell (with the help of CARTIER) on approximately six different occasions. Furthermore, law enforcement, using additional confidential sources, set up a second controlled purchase of cocaine paste from co-defendants Alexander Egidio Areiza Ceballos and Adrian Fernando Areiza Ceballos. In or about February 2024, prior to this controlled purchase, foreign law enforcement executed two search warrants on residences in Colombia and seized more than 100 kilograms of cocaine paste.

---

[1] Cocaine paste (also referred to as coca paste) is an intermediary product in the chemical extraction of cocaine from coca leaves. Cocaine paste is almost invariably converted into powder cocaine in the producing country before being exported to the United States. One kilogram of cocaine paste can yield more than one kilogram of cocaine.

In total, over the course of at least four years, CARTIER has laundered hundreds of millions of U.S. dollars through the Network's infrastructure and his unlicensed money remitting business.

The evidence in this case is overwhelming and compelling. As demonstrated above, it includes recorded conversations between CARTIER and UC-1 and CS-1, as well as recorded conversations involving CARTIER's co-conspirators, and seized narcotics. In addition, through the course of this investigation, law enforcement obtained search warrants for, among other things, email and iCloud accounts used by CARTIER and/or his co-conspirators and electronic devices belonging to CARTIER. Reviews of those recorded conversations, electronic devices, email accounts, and iCloud accounts have revealed, among other things, CARTIER's requests for contracts with the Cartier Companies (which were fake), the fake contracts themselves, his requests for wallet addresses to send the Tether, the wallet addresses he used, and documents confirming wire transfers from the Cartier Companies. The evidence also includes, among other things, financial records showing the hundreds of millions of dollars that flowed through the Cartier Companies, the bank applications for the Cartier Companies that included false statements, the falsified documents that CARTIER sent to a bank, and the business records for the Cartier Companies.

### III. LEGAL STANDARD

The Bail Reform Act of 1984 (the "Act") permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). The Court "does not need to find both bases are proven in order to order a defendant's detention," as a finding of either dangerousness or risk of flight may justify remand. *United States v. Epstein*, 425 F. Supp. 3d 306, 312 (S.D.N.Y. 2019). The Government must show "by clear and convincing evidence that the defendant presents a danger to the community and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (internal quotation marks omitted); *see United States v. Brennerman*, 705 F. App'x 13, 16 (2d Cir. 2017) (setting threshold for preponderance of evidence as a "circumstance [that] was more likely than not" (internal quotation marks omitted)).

The Act requires consideration of (1) the nature and circumstances of the offenses; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g). Although the Act "lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant." *United States v. Zhang*, 55 F.4th 141, 149 (2d Cir. 2022). And while some courts have described the weight of the evidence as the least important factor, *see United States v. Paulino*, 335 F. Supp. 3d 600, 613 (S.D.N.Y. 2018) ("[M]any courts have suggested that the weight of the evidence is the least important of the various factors."), the Second Circuit has made clear that "a preliminary assessment of the strength or the weakness of the evidence can be a key consideration in whether the defendant is dangerous or poses a flight risk, and such a finding does not in fact impinge upon the presumption of innocence, *Zhang*, 55 F.4th at 152; *see also English*, 629 F.3d at 317 ("The weight of the evidence against the defendant is a factor that is to be taken

into consideration . . . . As far as this Court is concerned, it is one of the most important factors to consider.").

As in a preliminary hearing, the Government may meet its burden "by proffer alone." *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (internal quotation marks omitted). "[B]ail hearings are typically informal affairs, not substitutes for trial or discovery," and so "courts often base detention decisions on hearsay evidence." *United States v. Abuhamra*, 389 F.3d 309, 321 n.7 (2d Cir. 2004) (internal quotation marks omitted).

## IV. <u>DETENTION IS WARRANTED IN THIS CASE</u>

The Section 3142(g) factors compel detention in this case for the reasons set forth below.

***Risk of Flight.*** Without a doubt, it is "more likely true than not true" that CARTIER is a flight risk. *Brennerman*, 705 F. App'x at 16. To start, CARTIER's ties to the United States are extremely weak and his ties abroad are strong. CARTIER has no apparent ties to the Southern District of New York—the district where he is charged and in which he will be tried—and minimal ties to the United States outside of an address for a residence in California that CARTIER has provided to some financial institutions, but which is held in the name of a different individual. *See, e.g.*, *United States v. Lewis*, No. 16 Cr. 786 (NSR), 2017 WL 6547742, at *3 (S.D.N.Y. Dec. 20, 2017) (defendant lacked community ties where he had "no contacts with the community of New York," among other factors); *United States v. Alverez-Lopez*, No. 2:14-CR-45-FTM-38CM, 2014 WL 2563646, at *4 (M.D. Fla. June 6, 2014) (ordering defendant detained and determining risk of flight was "great" where defendant, among other things, had "NO ties to th[e] district" of prosecution, lacked financial ties to the community, and had a prior failure to appear and an ICE detainer); *United States v. Rivera*, 90 F. Supp. 2d 1338, 1343 (S.D. Fla. 2000), *aff'd*, 273 F.3d 397 (11th Cir. 2001) (finding defendant was a flight risk were, among other things, he "provided no evidence linking him to the Southern District of Florida" where he would be prosecuted). In addition, CARTIER is not a U.S. citizen, does not have status in the United States, has never lived in the United States, does not have family in the United States, and has extensive ties to Colombia, Argentina, France, and Monaco. In fact, at the time of CARTIER's arrest, he was simply passing through the United States: he entered the United States on or about February 17, 2024, and had a flight booked for Costa Rica on or about February 24, 2024. CARTIER has spent exceedingly limited time in the United States in recent years and reported that his last trip to the United States was to California in 2022.

Moreover, CARTIER's ties abroad are strong. Indeed, CARTIER holds a valid passport for Argentina, he is a legal resident of France (and recently applied for citizenship), and he frequently travels internationally, including to jurisdictions from which it is difficult or impossible for the United States to extradite. In the last approximately 5 years, CARTIER has traveled to, among other places, France, Argentina, Colombia, Bermuda, Mexico, the Bahamas, the United Kingdom, the Dominican Republic, Hong Kong, Cuba, Egypt, the Maldives (which does not have an extradition treaty with the United States), Brazil, the Netherlands, and Peru. *See, e.g.*, *United States v. Amanat*, 454 F. Supp. 3d 358, 362 (S.D.N.Y. 2020) (finding "international travel" and "substantial connections with Dubai – a country with which the United States does not have an extradition treaty" weighed in favor of detention); *United States v. Routollo*, No. 87 CR 813, 1988 WL 147354, at *3 (E.D.N.Y. Jul. 8, 1988) (finding defendant's frequent travel to the Far East to

have increased the likelihood of flight); *cf. United States v. Fishenko*, 2013 WL 3934174, at *2 (E.D.N.Y. July 30, 2013) (noting that the fact that the defendant "frequently travels to Russia for business increases the likelihood of flight" (internal quotation marks omitted)).

Even further concerning with respect to flight risk are CARTIER's strong personal ties to France and Monaco where he has maintained personal residences, Colombia where his co-conspirators are located, Argentina where his siblings reside, and Hong Kong where he has done business. CARTIER also speaks multiple languages and, troublingly, he has access to overseas bank accounts, including in France and Argentina, and controls several shell companies. These are significant factors that weigh in favor of detention, especially given the fact that CARTIER's language skills mean that he can easily adapt to a number of different environments. *See, e.g., United States v. Mallory*, 268 F. Supp. 3d 854, 864 (E.D. Va. 2017) (finding risk of flight where, among other things, defendant "spent significant amount of time in China, he has at least $6,500 in a Hong Kong bank, and likely has unknown other foreign bank accounts given his text message to [a Chinese Government Official] where he asks that deposits be made into a foreign account under an alias"); *United States v. Bikundi*, 47 F. Supp. 3d 131, 137 (D.D.C. 2014) ("The Court finds that the defendant has continuing significant foreign ties to her country of origin, including potential access to funds located in Cameroon, and that this raises a significant concern about her serious risk of flight.").

CARTIER's lack of any ties to the Southern District of New York, coupled with his corresponding strong and significant ties abroad and financial resources, make clear that CARTIER poses an extreme risk of flight. In cases like this, courts have routinely remanded defendants. *See, e.g., United States v. Lin Feng*, No. 23 MJ 4263 (KMK), Dkt. No. 4 (S.D.N.Y. June 2, 2023) (remanding defendant where there were significant ties to the China and noting that "flight would really completely neuter the Government's ability to prosecute"); *United States v. Sterlingov*, 573 F. Supp. 3d 28, 37–38 (D.D.C. 2021) (finding no combinations of conditions to assure defendant's appearance based in part "lack of meaningful ties to the United States"); *United States v. Xiaorong You,* 2019 WL 2426659, at *4 (E.D. Tenn. June 10, 2019) *(*"The Court cannot ignore defendant's continuing significant foreign ties to her country of origin, including potential access to funds located in a bank in China, which raises a significant concern about her serious risk of flight."); *Zarrab*, 2016 WL 3681423, at *8 ("For purposes of deciding bail or remand, the Court finds most persuasive the following: Defendant's lack of ties to the United States; his significant wealth and his substantial resources; his extensive international travel; and his strong ties to foreign countries, including countries without extradition."); *United States v. Epstein*, 155 F. Supp. 2d 323, 326 (E.D. Pa. 2001) ("The crucial factor, however, is defendant's lack of ties to the United States and his extensive ties to Brazil with which no extradition treaty exists.").

Further heightening the risk of flight is the fact that CARTIER appears to have the means, knowledge, and access to resources needed to flee, including access to multiple overseas bank accounts and large sums of cryptocurrency. CARTIER, therefore, not only has powerful incentives to flee but also the apparent means and international connections to flee regardless of whatever conditions the Court may impose, including by eliminating legitimate means of travel. *See United States v. Babichenko*, No. 1:18-CR-00258-EJL, 2018 WL 4604015, at *4 (D. Idaho Sept. 25, 2018) (finding while defendant had strong ties to local community he also had powerful incentive to flee along with the means and connections to do so despite conditions ordered by the court); *United*

*States v. Martin*, No. CR417-208, 2017 WL 4080689, at *3 (S.D. Ga. Sept. 14, 2017) (detaining defendant based on risk of flight given that he "is an experienced traveler, and he has the financial resources as well as a powerful incentive to flee" and "coupled with the statutory presumption of flight"). This demonstrates a significant risk of flight. *See, e.g., United States v. Zarrab*, No. 15 CR 867, 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016) (finding pattern of "extensive international travel" and "ties to foreign countries" to "weigh in favor of . . . detention").

Finally, CARTIER's risk of flight is further heightened by the weight of the evidence and the potential penalties the defendant faces. As to the strength of the evidence, this case rests on CARTIERS's own words and deeds in, among other things, emails, messages, documents (including bank applications), and audio recordings of multiple conversations CARTIER has had with CS-1 and UC-1. The evidence gathered provides a 360-degree view into the Network, the Cartier Cell, CARTIER's bank fraud scheme, and CARTIER's operation of an unlicensed money remitting business to convert cryptocurrency into fiat currency. It is predominantly CARTIER's own words and recorded actions that form the basis of the charges—evidence that is incontrovertible and poses a strong incentive to flee, particularly where CARTIER is facing a maximum sentence of 85 years' imprisonment. *See Zhang*, 55 F.4th at 151 (2d Cir. 2022) ("Where, as here, the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight."); *United States v. Bruno*, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong . . . a defendant has stronger motives to flee" (internal quotation marks omitted)).

While the Government has not done a binding or precise Guidelines calculation, because the defendant's alleged crimes involved laundering millions of dollars of crime proceeds, his Guidelines are likely to be many years. The combination of the strength of the evidence and the potential penalties if convicted only heightens the defendant's incentive to flee. *See, e.g., United States v. Kwok*, No. 23 CR. 118-1 (AT), 2023 WL 3027440, at *4 (S.D.N.Y. Apr. 20, 2023) ("Defendant has much incentive to flee. He is facing a maximum sentence of more than 100 years' imprisonment, Gov. Mem. at 21, and the evidence against him is strong.").

V. **ANY PROPOSED BAIL PACKAGE WILL NOT ELIMINATE THE RISK OF FLIGHT**

CARTIER has not proposed a bail package. However, the Government anticipates that CARTIER may propose a bail package that is centered on a secured bond, home confinement, and location monitoring – components that would have limited efficacy in preventing flight. "Home detention and electronic monitoring" largely operate on the "word" of the defendant that he will be compliant. *United States v. Millan*, 4 F.3d 1038, 1049 (2d Cir. 1993) (internal quotation marks omitted). The reality is "electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology, and . . . monitoring equipment can be rendered inoperative." *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (internal quotation marks omitted). Indeed, courts have recognized that "GPS monitoring is inadequate, as ankle monitors can be removed and ensure only a reduced head start should a defendant decide to flee." *Kwok*, 2023 WL 3027440, at *7; *see, e.g., United States v. Megahed*, 519 F. Supp. 2d 1236, 1244 (M.D. Fla. 2007) ("Neither electronic monitoring nor the GPS system of surveillance defeats the resolute, resourceful, energetic, and non-compliant releasee. Even attentive and persistent monitoring by

personnel of Pre-trial Services leaves the possibility of some hours' delay in both notifying law enforcement of a releasee's departure and beginning an effective search . . . ."); *United States v. Anderson*, 384 F. Supp. 2d 32, 41 (D.D.C. 2005) ("Conventional electronic monitoring . . . would likewise give [the defendant] ample lead time if he wished to flee.");

"In a case where there is a substantial risk that the defendant will flee to another country, and where the means to successfully do so appear to exist, measures such as home confinement and electronic monitoring are not adequate to reasonably guard against such risk." *United States v. Mukhtar*, No. 12-CR-00004-MMD-GWF, 2012 WL 12953440, at *7 (D. Nev. July 17, 2012). That is particularly true here, where CARTIER has continually demonstrated his willingness to (i) lie on documents submitted to government agencies and financial institutions; (ii) submit falsified bank statements to financial institutions in furtherance of the Network's activities; and (iii) continue operating his unlicensed money remitting business after the DEA seized three of his bank accounts for receiving suspected drug proceeds. Such a brazen disregard for the truth and U.S. authorities does not inspire confidence that CARTIER would abide by any pretrial release conditions.

The other piece of an anticipated bail package is a secured bond, but a bond is far from sufficient to assure CARTIER's presence in court. The money that others are willing to put up does not outweigh an incentive for a defendant to flee. The bond simply sets up an easy trade for the defendant: his freedom—and an escape from a long period of incarceration—for the money and property of others. That trade is similar to ones other defendants have made. *See, e.g.*, Bail Forfeiture Order, *United States v. Ceglia*, 12 Cr. 876 (S.D.N.Y. March 24, 2015), ECF No. 160 (bail forfeiture order entered on a $250,000 bond, secured by four properties and signed by three family members, after defendant cut monitoring bracelet and fled); *United States v. Giordano*, 370 F.Supp.2d 1256, 1264 (S.D. Fla. 2005) ("Merely having access to significant funds is not enough; evidence of strong foreign family or business ties is necessary to detain a defendant even in the face of a high monetary bond."); *see also United States v. Possino*, No. CR 13-00048-SVW-3, 2013 WL 1415108, at *6 (C.D. Cal. Apr. 8, 2013) (finding fully secured bond of $500,000 supported by properties of defendant's parents and wife were "insufficient to mitigate against the risk of flight").

[Continued on next page]

V.      **Conclusion**

For the reasons stated above, the Court should detain the defendant pending trial.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s
Jennifer N. Ong
Assistant United States Attorney
Southern District of New York
(212) 637-2224

cc:     All Counsel (by email)
Pretrial Services (by email)