OCBLDehC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                     24 Cr. 133 (MKV)

MAXIMILIEN DE HOOP CARTIER,

          Defendant.

                                 Conference

------------------------------x

                                 New York, N.Y.
                                 December 11, 2024
                                 11:30 a.m.

Before:

                     HON. MARY KAY VYSKOCIL,

                                   District Judge

                    APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  JENNIFER ONG
    Assistant United States Attorney

JEFFREY MICHAEL COHN
    Attorney for Defendant

OCBLDehC

1          (Case called)

2          MS. ONG:  Good morning, your Honor.  Jennifer Ong for

3     the government.

4          THE COURT:  Good morning, Ms. Ong.

5          MR. COHN:  For Mr. De Hoop Cartier, it's Jeffrey Cohn.

6     Good morning, your Honor.

7          THE COURT:  Good morning, Mr. Cohn.  Good morning to

8     you, Mr. De Hoop Cartier.

9          Good morning again to our court reporter.

10         So we are here today for a conference.  The conference

11    was originally scheduled for last week because Mr. De Hoop

12    Cartier had written again, saying that he wanted another new

13    lawyer.  In the interim, Mr. Cohn has appeared.

14         You are retained counsel, sir?

15         MR. COHN:  Yes, your Honor.  I have not actually

16    received a fee yet, but hope springs eternal.

17         THE COURT:  That's between you and Mr. De Hoop

18    Cartier.

19         MR. COHN:  I am attempting to swerve us into the next

20    part of the proceeding, but I will wait for your Honor's

21    permission.

22         THE COURT:  All right.  So in light of that, Mr. De

23    Hoop Cartier, I assume that your two letters to me complaining

24    about your court-appointed lawyers are moot.

25         THE DEFENDANT:  Right.

OCBLDehC

1          THE COURT:  And you now have counsel, correct?

2          THE DEFENDANT:  Correct.  Yes, your Honor.

3          THE COURT:  All right.  So Mr. Cohn, two things with

4     respect to counsel that I want to talk to you about.  First is

5     I am vacating the orders that I entered at ECF, I believe, 41

6     and 42, which was authorizing prior CJA counsel to have his

7     colleague, an associate, function on the case.  Now that you

8     are substituted in, your substitution didn't remove him; it

9     only removed the CJA panel counsel.  But they go together, so

10    that order is going to be vacated.  All right?

11         MR. COHN:  Understood, your Honor.

12         THE COURT:  All right.  Next, how did Mr. De Hoop

13    Cartier have CJA counsel in the first place?

14         MR. COHN:  Your Honor, there were two checks that were

15    in the process of being issued from an account closed by the

16    bank.  Those funds, which ostensibly will provide my retainer,

17    but still have not been converted to negotiable form, shall we

18    say, are the only assets to which Mr. De Hoop Cartier had any

19    access.  So prior to them being issued --

20         THE COURT:  Other than all the properties that he owns

21    overseas, and such.

22         MR. COHN:  As I understand it, he does not own any

23    properties overseas.

24         THE COURT:  OK.  Can I get a copy of the financial

25    affidavit, please, that was submitted to the magistrate judge?

OCBLDehC

```
 1              MR. COHN:  Absolutely.  It should be part of the
 2     record.  I don't have it on me, but --
 3              THE COURT:  No, I know you don't.
 4              MR. COHN:  It should be part of the docket.
 5              THE COURT:  Yes, it should, but I don't have it.
 6              MR. COHN:  We will get it.
 7              THE COURT:  It may be in mag court.  I don't know.
 8              Does the government have it or have access?
 9              MS. ONG:  No, your Honor.
10              THE COURT:  All right.  I would like to see it,
11     please.
12              MR. COHN:  Absolutely.
13              THE COURT:  All right.  Next, Ms. Ong, let me ask you,
14     what is the status of the codefendants?
15              MS. ONG:  Your Honor, the codefendants were all
16     arrested and are in Colombia awaiting extradition.  Typically,
17     my conversations -- my understanding is that typically we do
18     not receive updates as to the status of their extradition.  I
19     did reach out to my counterparts in D.C. to ask.  I think we
20     anticipate that one of the defendants, I have been told,
21     extradition is anticipated soon, but they would not let me know
22     what "soon" meant.
23              THE COURT:  OK.
24              MS. ONG:  And I asked about the remaining defendants
25     that were all in the same extradition request, and they don't
```

OCBLDehC

1    have any status updates as of this time.

2               THE COURT:  OK.  But I am not going to hold up the

3    case against Mr. De Hoop Cartier.

4               MS. ONG:  Understood, your Honor.

5               THE COURT:  OK.  All right.  Counsel, do you need time

6    to confer?

7               MR. COHN:  No, your Honor, I am ready.

8               THE COURT:  All right.  What is the status of

9    discovery?

10              As you know, when you were before me on the

11   arraignment, I set a schedule pursuant to which discovery, you

12   told me, would be produced within six to eight weeks, and I set

13   a deadline for any motions addressed to discovery to be filed

14   by mid November.  I haven't seen any motions filed.

15              Is discovery complete?

16              MS. ONG:  Your Honor, we have been -- we have produced

17   the discovery -- all discovery in the government's possession

18   has been produced with two exceptions.  One exception was I

19   gave counsel a pen register data that we received, and Mr. Cohn

20   now has a copy of that.

21              We also received additional supplemental subpoena

22   return production from a company.  We received that on

23   December 2.  Because of the format in which those materials

24   were produced to us -- they were produced in what I understand

25   is called a load-ready format -- we had to upload them to our

OCBLDehC

1    document management system in order to Bates stamp them and

2    then to produce them out.  I understand as of this morning,

3    it's ready to be produced.  I let Mr. Cohn know.  We are

4    awaiting an estimate on the size to see whether or not that

5    could be easily provided to him via an electronic system or if

6    we are going to require some sort of thumb drive.  My hope is

7    that we could produce it to him electronically.

8           With that, your Honor, all of the government's -- all

9    the Rule 16 discovery materials in the government's possession

10   will have been produced, and we will continue to produce them

11   on an ongoing and rolling basis as we receive them.

12          THE COURT:  OK.  So Mr. Cohn, what is the status of

13   your review of discovery?  As I said, the deadline for motions

14   was November 15, I believe.

15          MR. COHN:  Yes, your Honor.  I have not reviewed

16   discovery.  I have not obtained copies of discovery.

17          THE COURT:  Well, that's not what counsel just said.

18          MS. ONG:  Your Honor, if I can make one addition.  My

19   understanding in reaching out to prior defense counsel was that

20   prior defense counsel and Mr. Cohn were going to make

21   arrangements for prior defense counsel to provide Mr. Cohn with

22   all the discovery that we have previously produced.  My

23   understanding from the e-mail communications that I was on was

24   that was going to happen on Monday, however, I understand that

25   I probably was left off communications about actual logistics.

OCBLDehC

| | |
|---|---|
| 1 | THE COURT:  I see. |
| 2 | So Mr. Cohn, you are saying you don't have them from |
| 3 | predecessor counsel? |
| 4 | MR. COHN:  Correct.  And I am scheduled to pick up a |
| 5 | hard drive later today.  More importantly, I think, Mr. De Hoop |
| 6 | Cartier only received the hard drive with discovery, I think, |
| 7 | about a week and a half ago, and he has no access to a computer |
| 8 | on the floor he is on, but -- |
| 9 | THE COURT:  If you make arrangements to go to MDC, |
| 10 | there are facilities there where he can access them in your |
| 11 | presence. |
| 12 | MR. COHN:  There are, and I can bring computers in, |
| 13 | but as far as -- I am just reporting to the Court what has been |
| 14 | the actual occurrences as regards to discovery. |
| 15 | And so, you know, I obviously want some time to go |
| 16 | over the discovery with Mr. De Hoop Cartier.  I think that the |
| 17 | application that's upcoming later today might speed things |
| 18 | along if it comes out the way we would like.  But I will be |
| 19 | prepared to report to the Court any desire I have for any |
| 20 | motions and, obviously, the Court can handle those requests as |
| 21 | it sees fit, given the prior motion deadline date. |
| 22 | THE COURT:  When do you think you can do this review? |
| 23 | If you are picking up the materials today, when are you going |
| 24 | to meet with the defendant? |
| 25 | MR. COHN:  I cannot meet with the defendant at the MDC |

OCBLDehC

1    until sometime late next week, and I am scheduled for a family

2    vacation.

3            THE COURT:  Right.  We are coming up to the holidays.

4    I understand.

5            MR. COHN:  I will submit a letter and I will,

6    obviously, respect any decision that the Court makes.  As I

7    understand the evidence in the case, I don't anticipate any

8    motions.  Now, that could change based on my review of the

9    actual computer files, because that's the way things are

10   produced these days.  And, obviously, I was just handed a pen

11   register result today.

12           THE COURT:  Yes.

13           MR. COHN:  I don't know what that's going to contain,

14   and there's still upcoming stuff.  But I can certainly commit,

15   at the Court's discretion, to filing a letter stating my

16   intentions as regards -- and levels of preparation as regards

17   to discovery and any potential motions.

18           THE COURT:  When?

19           MR. COHN:  I would like until the second week of

20   January to submit that letter, if it please the Court.

21           THE COURT:  All right.  Look, I am going to set

22   January 31 as the deadline for any motions.

23           MR. COHN:  Thank you, your Honor.

24           THE COURT:  All right.

25           MS. ONG:  Your Honor, if I may just correct one thing.

OCBLDehC

```
1              THE COURT:  Yes.

2              MS. ONG:  With regard to the productions of discovery

3    that have been provided to the defendant, we have provided a

4    hard drive with the discovery initially on July 22.  My

5    understanding from the tracking data is that was delivered to

6    MDC on July 23.  We have produced a second hard drive with

7    additional materials on September 19, which I understand was

8    delivered on September 20.  For whatever reason, MDC returned

9    that drive because it was not compatible with their policies.

10   We reproduced those materials on November 19.  They were

11   delivered to MDC on November 20.

12             So my understanding is that the defendant has all the

13   discovery materials that he is allowed to have in MDC, save the

14   materials that I just gave counsel today.

15             THE COURT:  I understand, but I appreciate what

16   Mr. Cohn is saying; that absent counsel being present, the

17   defendant can't access these things so easily at MDC.

18             Is that accurate?

19             MS. ONG:  Understood, your Honor.  I just wanted to

20   make it clear that Defendant should have two hard drives.

21             THE COURT:  Oh, OK.  So Mr. Cohn, you need to confirm

22   that with your client, that there should be two hard drives.

23             MR. COHN:  While Ms. Ong was speaking, Mr. De Hoop

24   Cartier did confirm that he received the hard drive in July and

25   then one again approximately a week ago.
```

OCBLDehC

```
 1            THE COURT:  OK.  Great.

 2            All right.  Any motions will be due by January 31, and

 3   I am setting trial then for June of this year.  Let me just

 4   take a look at the calendar.

 5            How long does the government think it needs to try its

 6   case?

 7            MS. ONG:  Your Honor, assuming that Mr. Cartier's

 8   codefendants are not here, present, we would estimate two

 9   weeks.  However, if there's stipulations, we anticipate that it

10   could be much shorter than that.

11            THE COURT:  Two weeks is a long time for this case to

12   be tried.  Because it's largely documentary, right?

13            MS. ONG:  That's correct, your Honor.

14            THE COURT:  So you can figure out how you can present

15   documentary evidence in summary fashion.

16            I am going to set the week of June 10 for the trial --

17   well, it's the week of June 9.  And you should prepare your

18   case to try it in one week.

19            MS. ONG:  Yes, your Honor.

20            THE COURT:  All right.  Mr. Cohn, are you still

21   intending to make a bail application?

22            MR. COHN:  Yes, your Honor.

23            THE COURT:  I entered an order directing you to file

24   any application by -- let me find the order.  You filed

25   nothing.  The government filed its opposition by the deadline.
```

OCBLDehC

1  My assumption was, since you filed nothing, that you had looked

2  at the record and concluded that it wasn't a meritorious

3  motion.

4          Why didn't you timely file anything?

5          MR. COHN:  Your Honor, perhaps I am mistaken, but as I

6  understood, your order merely directed me to state the

7  government's position and pretrial's position, and not to

8  provide documentary support of the argument I intended to make

9  in support of bail.  If I mistook that, then I apologize.

10         THE COURT:  It was to make your argument so that the

11  government could respond to it.  So the government instead

12  responded, anticipating what you were likely to say.

13         But how am I supposed to rule on a proposed package

14  when you haven't given me a proposed package?

15         MR. COHN:  I was intending to do it, as the courts

16  have authorized, by proffer today, in a case that was actually

17  cited by the government in their memo, and as is my normal

18  practice.  However, if your Honor wants to see something in

19  writing before an oral application, we can certainly schedule

20  an appearance, and I will have so writing in advance of that

21  date.

22         THE COURT:  Give me one moment.

23         This is an order entered on December 4, docket number

24  55:  "Accordingly, it is further ordered that on or before

25  December 9, 2024 at 5:30 p.m., defense counsel shall file on

OCBLDehC

1   the docket its bail application."

2           Counsel, I am warning you now, I am not going to

3   adjourn this because I don't have endless time to just keep

4   having multiple hearings in cases because counsel doesn't do

5   what it's supposed to do.  So I will hear your application, but

6   you are on notice that you need to comply with orders going

7   forward, and deadlines are for real.

8           MR. COHN:  Yes, your Honor, of course.

9           The application is for your Honor to release Mr. De

10  Hoop Cartier on a personal recognizance bond in the amount of

11  $250,000, to be secured by the signature of Jamie Murphy, a

12  United States citizen and retired professor, and a more than

13  30-year acquaintance of Mr. De Hoop Cartier.  He resides in

14  Tampa and is willing to welcome Mr. De Hoop Cartier into his

15  home.  He has net worth substantially in excess of the proposed

16  bond amount.

17          THE COURT:  Mr. Murphy does or Mr. De Hoop Cartier

18  does?

19          MR. COHN:  Mr. Murphy does.

20          Mr. De Hoop Cartier is a 57-year-old man who's never

21  had any contact with the criminal justice system before.  He's

22  been a successful entrepreneur virtually his whole life.

23  Despite his famous last name through which he is illegitimately

24  related to the Cartier family, he has been a self-made man his

25  whole life.  He had a successful beverage company that he sold

OCBLDehC

1    to a beverage giant.  And in about 2016, far ahead of the curve

2    in investment circles, he began trading cryptocurrency.  As the

3    business expanded, he essentially remained a one-man shop.

4          For reasons that have to do with the efficiency, the

5    quickness of the American banking system, he established

6    companies here to receive Bitcoin and then trade it for cash,

7    and he would make a small percentage in between, .5 percent.

8    And this business operated with his attempts at due diligence

9    to navigate the changing landscape, which still is changing as

10   of today, and comply with all the laws.

11         Just this morning, I had a ten-minute conversation

12   with a partner at a major firm -- I will get the name for your

13   Honor -- McDermott Will & Emery, named Joe Evans, who confirmed

14   for me that Mr. De Hoop Cartier engaged him approximately three

15   years ago, and that the law firm's advice, as with, according

16   to Mr. Evans --

17         THE COURT:  Are you waiving privilege?

18         MR. COHN:  Yes, we are, because Mr. Evans is going to

19   be a trial witness anyway if the case goes to trial.

20         THE COURT:  OK.

21         MR. COHN:  That Mr. De Hoop Cartier tried to get a

22   legal opinion from a prestigious firm about the requirement of

23   money remitting licenses in doing Bitcoin.  And Mr. Evans

24   explained to me that that area of the law is quite murky even

25   through today because it's governed by both state and federal

OCBLDehC

1    authorities.  Some states don't even consider cryptocurrency to

2    be money in the sense that it would require a money

3    transmitting license.

4            Mr. De Hoop Cartier also engaged the prestigious

5    investigation firm Kroll in the United States to seek opinions

6    on compliance.  The people with whom he engaged at Kroll, we

7    need to have him sort of recreate his contacts.  I have not

8    spoken to them yet.

9            He spoke with a former member of the SEC in the

10   financial compliance section, SEC employee.

11           THE COURT:  At Kroll, you mean?

12           MR. COHN:  No, no.  This is a separate person.

13           THE COURT:  Separate.  OK.

14           MR. COHN:  The point is, starting in 2016 and

15   continuing through 2021, he did everything in this burgeoning

16   industry to be in compliance and was doing good business.

17           In 2021, the DEA in Philadelphia, in a situation

18   completely unrelated to the current case, contacted him and

19   told him that some of the transactions in which he engaged were

20   suspicious; they wanted to speak to him.  He again engaged an

21   attorney.  He met with the DEA in Philadelphia, and after some

22   negotiation, they returned a lot of his money.  Not all of it;

23   a lot of it.

24           Unlike what the government said in its detention memo,

25   we have no proof and no knowledge, and believe that it's not

OCBLDehC

1    accurate, that that was part of a sting.  The government said

2    that money came from a DEA-controlled account.  As far as we

3    were concerned, those were legitimate clients.  Mr. De Hoop

4    Cartier went and confronted justice when he was asked, and he

5    had part of his money returned.

6          He does not know anyone in this indictment, and if you

7    examine the government's detention memo, the top line --

8          THE COURT:  When you say the government's detention

9    memo, are you talking about the December 10 letter?

10          MR. COHN:  Yes.

11          THE COURT:  OK.

12          MR. COHN:  Except for Mr. Estrada.  He does know

13    Mr. Estrada.  He has not had contact with Mr. Estrada since

14    2021, when a Bitcoin transaction was not honored by the

15    multi-billion-dollar Bitcoin processing firm in Hong Kong,

16    which Mr. De Hoop Cartier and many others used, because of a

17    problem with the block chain.  So they identified him in Hong

18    Kong, which is the place where Max sent all of his Bitcoin to

19    be exchanged for cash.  And Estrada's transaction was not

20    honored.  But that's the last contact he had with Mr. Estrada,

21    and that's three years ago.  He does not know anyone else in

22    this case.

23          And if you look at the government's memo, the

24    December 10 letter, as regards his involvement in any drug

25    trafficking, there is nothing there.  When they say that --

OCBLDehC

1    it's basically one paragraph talking about the drug

2    trafficking, which seems to have been a sting by the DEA to

3    sort of flesh out that these people were dealing drugs.  But

4    the point is, none of that conversation, none of that involved

5    Mr. De Hoop Cartier.

6              THE COURT:  Counsel, you are basically arguing to me

7    about his guilt or his innocence.  I appreciate that the weight

8    of evidence is a factor I can consider, but what I am supposed

9    to be evaluating is whether there are any set of conditions

10   that can ensure that he won't flee and that he won't be a

11   danger to the community.

12             So do you want to address those?

13             MR. COHN:  Absolutely.

14             On danger to the community, the government, as I

15   understand, is not seeking --

16             THE COURT:  They don't seem to be arguing that.

17             Is that correct, counsel?

18             MS. ONG:  That's correct, your Honor.

19             MR. COHN:  There is zero evidence, apart from the fact

20   that he was not a United States resident, about his intention

21   to flee.  That's the only thing the government is relying on.

22   There is no mandatory minimum here so, you know, given that

23   this is a -- would be a first-time offense for a 57-year-old

24   man with no prior connection with the -- or confrontation with

25   the criminal justice system anywhere in the world, he would be

OCBLDehC

```
1    eligible for a sentence of time served, in a technical way.
2    He's already served ten months in some of the harshest
3    conditions that are depriving him of medical care regarding
4    hemorrhoids and hearing loss.  He is not an 18-year-old.  Being
5    in the MDC, which I am sure your Honor has heard from other
6    cases, is --
7              THE COURT:  Yes, but none of that is addressing the
8    risk of flight.
9              What are his ties to this jurisdiction, to the U.S.?
10   What about all of his numerous overseas ties?
11             MR. COHN:  Well, he's lived his whole life overseas.
12             THE COURT:  Right.
13             MR. COHN:  To say he's got overseas ties is not a
14   nefarious thing.
15             THE COURT:  No, it's just a reality.
16             MR. COHN:  It is a reality, but when you have someone
17   who has shown the kind of intention to confront the system that
18   Mr. De Hoop Cartier has, when you have --
19             THE COURT:  What does that mean, "the kind of
20   intention to confront the system"?
21             MR. COHN:  He was called from Paris to come meet with
22   DEA in Philadelphia, and he did it, and he resolved that
23   situation.  He is informing me now that he wasn't even asked to
24   come.  He insisted on coming.
25             His livelihood is based on his ability to continue
```

OCBLDehC

1    doing what he believes to be legal business, and that gives him

2    powerful incentive to be cleared of the crimes that he's been

3    accused of in this case, and he needs to be fully participating

4    in the preparation of his defense to do that.  That is a

5    powerful incentive to confront this case.

6        And when we say that there is no mandatory minimum

7    penalty, and that we have a man here who's known Mr. De Hoop

8    Cartier for 30 years, who's willing to sign a bond which

9    represents a significant portion, although not all, of his net

10   worth --

11       THE COURT:  250,000?

12       MR. COHN:  -- yes, your Honor -- who is offering his

13   house as a place where Mr. De Hoop Cartier can reside, with

14   conditions that your Honor can set to allow supervision --

15       THE COURT:  Like what?

16       MR. COHN:  Monitoring, electronic monitoring, curfews,

17   home detention.

18       All I need him to do is to have access to a computer

19   and a telephone, and he can participate in his defense in a way

20   that I think will make acquittal in this case substantially

21   more likely.

22       THE COURT:  And access to a computer enables him to

23   continue some of the conduct that he's accused of committing in

24   terms of the offense.

25       MR. COHN:  The legal conduct, yes, to support himself.

OCBLDehC

1    There is nothing illegal about trading cryptocurrency.

2              THE COURT:  Again, though, you are arguing the merits

3    of the case, which is not what's before me right now.

4              MR. COHN:  Well, the government has almost exclusively

5    relied on the strength of the case --

6              THE COURT:  No, the government relies very heavily on

7    his lack of any ties to this jurisdiction, to the U.S., his

8    incentive to flee given the substantial penalty he would face

9    if he were convicted.  You are saying he faces no time because

10   you are assuming he is going to be acquitted.

11             MR. COHN:  I am also --

12             THE COURT:  But I can't assume that.

13             MR. COHN:  I am also saying there's no mandatory

14   minimum for any of these crimes.

15             THE COURT:  That's not the standard.

16             MR. COHN:  There is no presumption that he is going to

17   flee.  And if it's the case that unless someone lives in the

18   United States and is charged with a federal crime, they should

19   never get bail --

20             THE COURT:  Where was he arrested?

21             MR. COHN:  In Miami Beach.

22             THE COURT:  As he was passing through the country?

23             MR. COHN:  He was on his way to Los Angeles to do a

24   singing engagement, which is another profession in which he is

25   engaged, as a professional singer.

OCBLDehC

```
 1              But again, this is not the first time he's been
 2    confronted with what I will say are the vicissitudes of the
 3    legality of Bitcoin trading.  And in prior occasions, even
 4    without being asked, he's confronted it directly right here in
 5    the United States voluntarily, twice.  And I believe, your
 6    Honor, given Mr. Murphy's offer, given that history, those are
 7    powerful pieces of evidence that your Honor could rely on to
 8    find that the government cannot carry its burden to prove that
 9    he is a risk of flight.
10              THE COURT:  OK.  Let me hear from the government.
11              MR. COHN:  Just --
12              THE COURT:  I'm sorry.
13              MR. COHN:  I was almost finished.
14              May I have a moment?
15              THE COURT:  Of course.
16              (Conferring)
17              MR. COHN:  Thank you, your Honor.
18              THE COURT:  So you are finished?
19              MR. COHN:  Yes, your Honor.
20              THE COURT:  OK.  Ms. Ong.
21              MS. ONG:  Thank you, your Honor.
22              We agree with the pretrial services from the Southern
23    District of Florida that there are no conditions or set of
24    conditions that will reasonably assure the defendant's
25    appearance.
```

OCBLDehC

1          The government submitted a lengthy submission to your

2     Honor, and I don't want to repeat everything in it, but I do

3     want to highlight a few things.  First, that the defendant has

4     strong and substantial ties abroad.  He's an Argentinian

5     citizen, a legal resident of France, and I understand that he

6     applied for citizenship; frequent travel abroad.  He has

7     residences abroad.  He has coconspirators in Colombia.  And I

8     will say, although he is listed on the indictment and charged

9     with some coconspirators, not everyone in this network that we

10    have described in the complaint has been arrested.  He has

11    siblings in Argentina.

12          THE COURT:  What's the significance of that, that his

13    codefendants haven't been arrested?

14          MS. ONG:  Well, I apologize, your Honor.  To be clear,

15    his codefendants have been arrested, but there are

16    coconspirators as part of the money laundering network that

17    he's worked with that are in Colombia --

18          THE COURT:  I see.

19          MS. ONG:  -- who have access to significant funds

20    abroad.

21          Second, as your Honor has noted, the defendant has a

22    corresponding lack of ties, apparently no ties in the United

23    States.  He hasn't lived here.  He has no legal status here, no

24    family here.  And again, he was arrested while passing through

25    the United States.  My understanding is that he had a flight

OCBLDehC

1    booked to Costa Rica on February 24 of 2024.  He was arrested

2    on February 22, having landed in the country on about

3    February 17.  And the last time he was in the U.S. was in

4    California, but that was in 2022.

5            The defendant also has a strong incentive to flee

6    here.  While there are no mandatory minimums, the statutory

7    maximum is 85 years.  There is a high guidelines range because

8    of the hundreds of millions of dollars that have been

9    laundered.  And the evidence is compelling and overwhelming.

10   We would disagree with the representations made by defense

11   counsel.  I understand that really gets into -- this isn't a

12   mini trial, but I am happy to address any questions your Honor

13   may have about the proffer that defense made.

14           Finally, the defendant --

15           THE COURT:  I have your proffer and your written

16   submission, so you don't need to put it on the record again.

17   That's at ECF 58, just for the record.

18           MS. ONG:  Yes, your Honor.  Thank you.

19           And again, the defendant has resources to flee.  He

20   has access to overseas bank accounts.  He has access to an

21   extensive network of shell companies both in the United States

22   and abroad.  He speaks multiple languages, and he clearly has

23   access to other funds that were unbeknownst to the government,

24   that weren't reported to pretrial services.  I understand that

25   these checks didn't clear or, you know, whatever the case may

OCBLDehC

1    be, but they are still out there and he now seemingly will have

2    access to them.

3    　　　　And finally, there are some concerns about the

4    pretrial services report and his candor to them.  I will note

5    that in the Southern District of Florida report, he reports

6    that he had lunch with his ex-girlfriend in Miami, but then

7    somehow could not remember that person's name, and I think

8    that's concerning in terms of his forthcoming and his

9    truthfulness.

10    　　　　THE COURT:  Yes.

11    　　　　MS. ONG:  And he neglected to say all the places that

12    he's worked at.  As the government wrote in the complaint,

13    there are a number of businesses, and as defense counsel

14    alluded to, there are a number of businesses in the United

15    States that the defendant used in order to conduct what we

16    allege to be illegitimate activity and what defense is alleging

17    was legitimate activity.  Regardless, those companies are not

18    listed in the pretrial services report.

19    　　　　The defense has proposed a bail package that the

20    government would -- the government's position is that it's

21    insufficient.  It's similar to the proposed bail package that

22    the government anticipated in its submission.  Your Honor has

23    that, and so I will not go over all that again unless your

24    Honor has any questions.

25    　　　　But for those reasons, your Honor, we would

OCBLDehC

1    respectfully agree with the recommendation of pretrial services

2    that there are no conditions or set of conditions that would

3    reasonably assure the defendant's appearance.

4            THE COURT:  All right.  Thank you.

5            So as the parties know, I ordered that any application

6    be filed on the docket.  I received no written application from

7    the defendant, but I have now orally heard Defendant's

8    application and proposed package of -- package of proposed bail

9    conditions.

10           I, by way of background, have reviewed the pretrial

11   services report prepared by pretrial services in the Southern

12   District of Florida.  That was made available to me.  It is

13   dated February 23 of 2024, in which that office concluded there

14   is no condition or combination of conditions to reasonably

15   assure the defendant's appearance in court, and recommending

16   detention.  I have also reviewed the bail disposition sheet

17   prepared by the magistrate judge in this case, who I believe

18   was Magistrate Judge Willis -- correct --

19           MS. ONG:  Yes, your Honor.

20           THE COURT:  -- at the time of the defendant's

21   presentation here in the Southern District of New York.  I

22   understand that at the time of presentment, the defendant was

23   detained on consent without prejudice.  I then conducted

24   arraignment on June 12, 2024, at which time Mr. De Hoop Cartier

25   was again detained on consent without any applications being

OCBLDehC

1    made at that time.

2          Now, under Section 3142 which governs the release or

3    detention of a defendant pending trial, the defendant is to be

4    detained if I find no condition or combination of conditions

5    will reasonably assure his appearance as required or the safety

6    of any other person or the community.  The government is not

7    arguing that Mr. De Hoop Cartier poses a risk of danger to the

8    community or to any particular person.  It's arguing, as the

9    pretrial services office in Florida found, that he does pose a

10   risk of flight.

11         In that case, the government bears the burden of

12   proving risk of flight by a preponderance of the evidence.  I

13   am obligated under subsection (g) of 3142 to consider a number

14   of factors, including the nature and circumstances of the

15   offense charged, the weight of the evidence against the person,

16   the history and characteristics of the person, including, and

17   then there are a number of enumerated subfactors for me to

18   consider.  The fourth factor, the nature and seriousness of the

19   danger, is not relevant here since the government isn't arguing

20   danger.

21         I do find that there are no condition or combination

22   of conditions that will reasonably assure the defendant's

23   appearance in light of the record before me.  Most

24   specifically, Mr. De Hoop Cartier has very weak, if any, ties

25   to the Southern District of New York, and very weak ties to the

OCBLDehC

```
 1    U.S.  He is not a U.S. citizen.  He doesn't have legal status
 2    in the U.S.  He's never lived in the United States.  He has no
 3    family here.  At the time of his arrest, he was simply passing
 4    through the United States.  He entered the U.S. on February 17
 5    of this year and had a flight booked to travel to Costa Rica
 6    one week later, on February 24.
 7          By contrast, he has very strong ties abroad.  He has
 8    extensive ties to Colombia, Argentina, France, Monaco.
 9    Specifically, he was born in Argentina.  He has a valid
10    passport for Argentina.  That passport, I believe, was seized
11    by the arresting agents in Miami.  He is a legal resident of
12    France, having lived there since 2019, and it's the Court's
13    understanding that he recently applied for citizenship in
14    France.  Previously, he lived in Monaco for seven years, where,
15    it's the Court's understanding, he owns property.  He lived in
16    Switzerland for 15 years, in England for two years.  He has no
17    family ties here in the U.S.  His parents are deceased, but he
18    has two siblings, both of whom reside in Argentina.  His
19    girlfriend is a Russian national who lives in Costa Rica.
20          I do note and agree with the observation by the
21    government about concerns about lack of forthcoming information
22    from the defendant that was provided to pretrial services in
23    Miami.  I noted myself in particular, pretrial services says
24    the defendant advised that his ex-girlfriend resides in Miami.
25    He couldn't recall her name, despite the fact that they had
```

OCBLDehC

1    lunch together two days prior.

2         The defendant frequently travels internationally,

3    including two jurisdictions from which it would be difficult or

4    impossible to extradite.  In the last five years, he's traveled

5    to, among other places, France, Argentina, Colombia, Bermuda,

6    Mexico, the Bahamas, the United Kingdom, the Dominican

7    Republic, Hong Kong, Cuba, Egypt, the Maldives, Brazil,

8    Netherlands, and Peru.

9         And as I said, he has strong personal ties to France

10   and Monaco, where he reportedly maintains personal residences;

11   also to Colombia, where his alleged coconspirators are located;

12   to Argentina, where he was born and where his siblings reside;

13   and to Hong Kong, where he does, by his counsel's own

14   admission, substantial business.  I note the defendant also

15   speaks multiple languages and has access to numerous bank

16   accounts, including accounts in France and Argentina, and he

17   controls several shell companies.  All of this is to say that

18   he appears to have the means, knowledge, access to resources

19   needed to flee, including access to multiple overseas accounts

20   and large sums of cryptocurrency.

21        So not only does he have strong incentive to flee,

22   given that he does face a significant potential term of

23   imprisonment, but he also apparently has the means and

24   international connections to flee, notwithstanding any

25   conditions that I might impose.

OCBLDehC

1          I do find, although I am not, obviously, prejudging

2     the merits, I do find that the weight of the evidence also

3     weighs in favor of the Court's ruling.  The evidence here is

4     extensive, including e-mails, messages, documents, bank

5     applications, audio recordings.  As I say, I am not judging the

6     merits, but all of that supports the Court's conclusion that no

7     set of conditions will ensure the defendant's appearance.

8          Now, in terms of the conditions that have now been

9     proposed orally by the defense, including a secured bond and

10    then home confinement and some kind of monitoring, location

11    monitoring or other monitoring, the Second Circuit has

12    recognized that home detention and electronic monitoring

13    operate largely on the word of the defendant that he is going

14    to be compliant, and that electronic surveillance systems can

15    be readily circumvented.

16         Mr. De Hoop Cartier has continually demonstrated a

17    willingness to lie on documents that he has submitted to

18    government agencies and institutions, to be less than

19    forthcoming with court officials, including the pretrial

20    services office in Florida at the time of his arrest.  He has

21    submitted what are alleged to be false bank statements to

22    financial institutions.  He continues to operate what's alleged

23    to be an unlicensed money remitting business after the DEA

24    seized three of his accounts.  Now, I understand the

25    defendant's position is that those were returned.

OCBLDehC

1           So for all of these reasons, I find that none of the

2    proposed conditions are adequate to secure the defendant's

3    future appearance.  I should address specifically the proposal

4    of a secured bond.  First of all, I find that the amount

5    proposed, in light of the alleged amounts of money that were

6    laundered here, to be de minimis.  It's also insufficient in

7    that it really doesn't provide any incentive for Mr. De Hoop

8    Cartier himself to show up.

9           So for all of these reasons, the defendant's

10   application to be released on the proposed sets of conditions

11   is denied.  The Court does find that there are no conditions or

12   set of conditions that will reasonably assure the defendant's

13   appearance.

14          All right.  We should set a date for a further

15   conference or status report.  January 31, any motions are due.

16   Mr. Cohn, at that time or before that, if you would please

17   confer with the government so that you can file on the 31st

18   either whatever motions you are going to file or a joint status

19   letter telling me the status of things.

20          And as I say, I have set trial for June 9.  You should

21   look at my individual practice rules for what it is that you

22   are required to do to prepare for a trial on that date.  When I

23   get the motions or the letter on January 31, I will decide at

24   that time whether we need a further conference.  Certainly, we

25   will need a pretrial conference if the case isn't resolved

OCBLDehC

1      consensually in advance of trial.

2              Is there anything else?

3          MS. ONG:  Yes, your Honor.  The government would move

4      to exclude time between today and January 31 to allow the

5      parties to review discovery, contemplate any motions, and make

6      any preparations for trial or discuss any pretrial resolutions.

7      We believe such an exclusion of time would be in the interest

8      of justice.

9          THE COURT:  All right.  Mr. Cohn?

10         MR. COHN:  No objection.

11         THE COURT:  All right.  Without objection, then I

12     exclude all time from today to January 31 of 2025.  I do find

13     that the interests of justice served by the exclusion of such

14     time outweigh the interests of the defendant and the public in

15     a speedy trial in that it will allow newly-retained counsel,

16     Mr. Cohn, to review all of the discovery that's been produced

17     by the government, both on his own and to meet with Mr. De Hoop

18     Cartier to review all of that evidence that's been produced, to

19     evaluate whether any motions are in order, to prepare and file

20     any appropriate motions, and to prepare for trial and/or

21     discuss a potential consensual resolution of the case.

22             Is there anything further?

23         MS. ONG:  Nothing from the government, your Honor.

24         THE COURT:  Mr. Cohn?

25         MR. COHN:  Just on the record for the bail

OCBLDehC

```
 1    application, the woman in Costa Rica was a girlfriend who was a
 2    photographer.  She didn't live in Costa Rica; she was traveling
 3    there for a photography assignment, and she is no longer his
 4    girlfriend.  That's just a fact I wanted to clarify.
 5              THE COURT:  You are talking about the person he had
 6    lunch with in Miami?
 7              MR. COHN:  No, that's a different --
 8              THE COURT:  That's a different ex-girlfriend.  OK.
 9    Thank you.
10              All right.  But is there anything else from you for
11    the record then?
12              MR. COHN:  No.
13              THE COURT:  All right.  Then we will stand adjourned.
14    Thank you, everyone.  Thank you to the court reporter and to
15    the marshals.  Thank you very much.
16              Mr. De Hoop Cartier, I am going to warn you again, as
17    I did at the outset of this case, the fact that you decide that
18    you want to change lawyers, that you are not happy with lawyers
19    who are provided to you, will not again cause any of the
20    deadlines that have been set in this case to change.  You have
21    competent counsel.  You had two prior sets of competent
22    counsel.  The deadlines are what they are, and they will not be
23    adjourned.
24              Do you understand?
25              THE DEFENDANT:  Yes, your Honor.
```

OCBLDehC

1              THE COURT:  All right.  Thank you.  We stand adjourned

2     then.

3              (Adjourned)