UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MAXIMILIEN DE HOOP CARTIER,

Defendant.

S4 24 Cr. 133 (MKV)

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
## TO THE DEFENDANT'S MOTION TO DISMISS COUNTS THREE AND FOUR OF THE
## FOURTH SUPERSEDING INDICTMENT

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Jennifer N. Ong
Eli J. Mark
Assistant United States Attorneys
        *-Of Counsel-*

## TABLE OF CONTENTS

FACTUAL BACKGROUND ........................................................................................................... 1

PROCEDURAL BACKGROUND .................................................................................................. 5

ARGUMENT ...................................................................................................................................... 6

   I.     The Court Should Deny the Defendant's S4 Motion to Dismiss Counts Three and
Four .................................................................................................................................... 6

        A.      Applicable Law ......................................................................................... 7

        B.      Count Four Sufficiently Alleges a Scheme to Defraud ............................. 9

            1.      Count Four Alleges a Scheme to Obtain Property Under a Bank's
Control ......................................................................................... 10

            2.      A Customer's Account is Property Owned By the Bank ......................... 14

        C.      Count Three Sufficiently Alleges an Offense ....................................... 17

CONCLUSION .................................................................................................................................. 18

## TABLE OF AUTHORITIES

**Cases**

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952) .............................. 8, 13

*Ciminelli v. United States*, 598 U.S. 306 (2023).................................................................9, 11

*Costello v. United States*, 350 U.S. 359, 363 (1956)...................................................................7

*Hamling v. United States*, 418 U.S. 87, 117 (1974) ...................................................................7

*Shaw v. United States*, 580 U.S. 63 (2016) ........................................................................ 14, 15

*United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)........................................................8

*United States v. An*, 733 F. Supp. 3d 77, 91 (E.D.N.Y. 2024)...........................................11, 15, 16

*United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 305 (S.D.N.Y. 2023)........................11, 16

United States v. Braeger, No. 21-CR-233, 2023 WL 2136722, at *1 (E.D. Wis. Feb. 21, 2023). 16

*United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021) ......................................................9

*United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) .............................................. 1, 7

*United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985)......................................................8

*United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007)...........................................................9

*United States v. Kwok*, No. 23 CR. 118 (AT), 2024 WL 1407057, at *9 (S.D.N.Y. Apr. 2, 2024) ...................................................................................................................................... 12, 15, 16

*United States v. Motovich*, No. 21-CR-497 (WFK), 2024 WL 2943960, at *4 (E.D.N.Y. June 11, 2024) .............................................................................................................................. 12, 15

*United States v. Navarro*, 551 F. Supp. 3d 380, 388 (S.D.N.Y 2021)........................................ 13

United States v. Perez, 575 F.3d 164, 166 (2d Cir. 2009) .............................................................9

*United States v. Phillips*, 690 F. Supp. 3d 268, 277 (S.D.N.Y. 2023) ....................................... 13

*United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013)........................................7, 8, 11

*United States v. Vilar*, 729 F.3d 62, 80 n.16 (2d Cir. 2013) .......................................................7

*United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999)..............................................................8

*United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018) ...........................................................9

*United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017) 12

*United States v. Williams*, 504 U.S. 36, 54 (1992)......................................................................9

*United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) ............................................ 1, 7, 9, 10

**Rules**

Fed. R. Crim. P. 12(b ...................................................................................................................8

Fed. R. Crim. P. 7(c) ................................................................................................................... 1

Fed. R. Crim. P. 7(c)(1)............................................................................................................. 13

The Government respectfully submits this memorandum of law in opposition to defendant Maximilien de Hoop Cartier's motion to dismiss Counts Three and Four of Superseding Indictment No. S4 24 Cr. 133 (the "S4 Indictment") (the "S4 Motion to Dismiss" or "S4 Def. Mot."). (Dkt. No. 142).  The defendant's motion should be denied. The defendant comes nowhere near meeting his heavy burden to obtain dismissal of Counts Three and Four of the S4 Indictment, which, as this Court knows well, is an "extraordinary remedy" reserved for "extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001). Many of the defendant's arguments in favor of dismissal rely on extraneous factual assertions and characterizations of the S4 Indictment's allegations that go beyond the face of the indictment and are more appropriately raised at trial. The S4 Indictment, which tracks the language of the statute and contains a detailed "to wit" clause, is more than sufficient to satisfy the pleading requirements under Rule 7(c) of the Federal Rules of Criminal Procedure. *See United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (to satisfy the pleading requirements of Fed. R. Crim. P. 7(c), "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime.").

## FACTUAL BACKGROUND

Since at least in or about January 2020, the defendant has played a key role in a sophisticated money laundering network (the "Network") that utilized the U.S. financial system to launder the proceeds of illicit activity through the United States to Colombia, among other countries. Specifically, the defendant used several U.S.-based shell companies and U.S.-based bank accounts to act as an over-the-counter cryptocurrency exchange to convert cryptocurrency—

usually Tether or USDT[1]—to fiat currency, which the defendant then wired from his U.S. bank accounts to other individuals' bank accounts in other countries, including Colombia. At times, the defendant used fake technology services contracts between his shell companies and Colombia-based shell companies to justify wires to Colombia-based bank accounts.  (Dkt. No. 1 (the "Compl.")  ¶¶ 18(b), 23).

As part of this money laundering operation, the defendant controlled, operated, or was connected to—via incorporation documents, documents submitted to the Internal Revenue Service ("IRS"), or applications submitted to U.S. financial institutions—several shell companies incorporated in Delaware by the same registered agent (the "Shell Companies"). (Compl. ¶ 13(c)). The Shell Companies include:

1. Vintech Capital LLC ("Vintech Capital"), which was incorporated in or about July 2018. According to Vintech Capital's social media profile, the company purports to provide services in the financial sector and further claims to be a "Leader in Institutional Sized Liquidity Over the Counter (OTC) for the Digital Asset Markets."[2]

2. VC Innovated Technologies LLC ("VC Innovated"), which was incorporated in or about September 2019.  According to documents submitted to the IRS, VC Innovated purports to provide the following services: "Blockchain Technology, AI [artificial intelligence], VR [virtual reality]."

3. AZ Technologies LLC ("AZ Technologies"), which was incorporated in or about January 2020. According to documents submitted to the IRS, AZ Technologies purports to provide the following services: "Software, Hardware, AI [artificial intelligence], and Blockchain Technology."

4. Softmill LLC ("Softmill"), which was incorporated in or about January 2020. According to documents submitted to the IRS, Softmill purports to provide the

---

[1] Tether (also known as USDT) is a Stablecoin or a fiat-collateralized token that is backed by the U.S. dollar.

[2] Vintech Capital, LINKEDIN, https://www.linkedin.com/company/vintechcapital/about/  (last visited September 10, 2025).

following services: "Software, Hardware, AI [artificial intelligence], and Blockchain Technologie [sic]."

5.  Sun Technologies LLC ("Sun Technologies"), which was incorporated in or about November 2020. According to documents submitted to the IRS, Sun Technologies provides "Digital Technology Solution."

6.  Bullpix Solutions LLC ("Bullpix"), which was incorporated in or about November 2020. According to documents submitted to the IRS, Bullpix purports to provide the following services: "Digital advertising, IT platform, Software."

(Compl. ¶ 13).

The defendant also opened U.S.-based bank accounts for each of the Shell Companies and, in doing so, represented himself to the banks to be the figurehead of a legitimate business involved in the technology or software industry. (Compl. ¶¶ 14, 27). The detail that the defendant provided to the banks varied by institution. Some examples are included below:

- The defendant opened multiple bank accounts at a particular U.S. bank ("Bank-1"). As part of the account opening application process, Bank-1 asked its customers to provide their North American Industry Classification ("NAICS") Code and, in some cases, Bank-1 asked for a more detailed business description. In or about August 2018, the defendant opened an account at Bank-1 for Vintech Capital. The defendant listed the NAICS Code and description: "Software Publishers – 511210" and the following detailed description: "The business provides storage on servers to businesses. Businesses can pay for storage on servers []." In or about October 2019, the defendant opened an account at Bank-1 for VC Innovated and listed the NAICS Code and description: "Software Publishers" and 511210. The defendant provided the following detailed description: "APP DEVELOPMENT AND FIN TECHNOLOGY." When asked to list the relevant countries of significant clients, the defendant listed the United States. In or about February 2020, the defendant opened an account at Bank-1 for AZ Technologies. The defendant provided the NAICS code and description: "Software Publishers" and 511210, and the following detailed description: "Technology." (Compl. ¶ 14(a)-(c)).

- The defendant opened multiple bank accounts at another U.S. bank ("Bank-2") for VC Innovated, AZ Technologies, and Softmill. In its account opening documents, Bank-2 asked potential customers to describe the "Nature of Business." In completing the application, the defendant stated the following: (i) in or about November 2019, the defendant listed "Software Publishers" for VC Innovated; and (ii) in or about March 2020, the defendant listed "Data Processing, Hosting, and Related Services" in separate applications for AZ

Technologies and Softmill. (Compl. ¶ 14(d)). In or about May 2020, a representative of Bank-2 asked the defendant to explain VC Innovated's business activity relating to a "High Risk Country (Colombia)," and VC Innovated's transaction activity between Hong Kong and Colombia. The representative also asked the defendant to list the companies he worked with in the United States and Colombia, and the services the Colombian companies provided. As part of his scheme, the defendant responded with a presentation about VC Innovated and then told the representative that VC Innovated worked with Google LLC, Facebook, Inc., Gemini Trust Company, LLC, and Microsoft Corp. in the United States.

- In or about November 2021, the defendant opened a bank account for Sun Technologies at another U.S. bank ("Bank-3"). The defendant indicated "SOFTWARE DEV COMPANY" when prompted for the "Nature of Business" and "Services-Business" when prompted for "Type of Industry." The defendant and another individual ("Individual-1") were listed as co-signers on the account. The defendant's Sun Technologies account at Bank-3 was enrolled in a rewards program and had a 3-month average reward balance of approximately $157,703. (Compl. ¶ 14(e)).

- In or about November 2021, the defendant opened an account for Bullpix at a fourth U.S. bank ("Bank-4"). The defendant and Individual-1 were listed as owners on the account. In its business account application, Bank-4 required its customers to provide information about the business's industry and a description of the business. Bullpix listed "Professional, Scientific, and Technical Services" for its industry and "Software development and implantation" for its description of business. As part of his scheme, on or about March 2023, the defendant sought to optimize Bullpix's account at Bank-4 to potentially save money on wire transfers. Bank-4 understood based on information provided by the defendant that Bullpix offered "business to business services" along with "Business intelligence, IT strategies, personal computing, cloud solutions. VR & AI , PWA y [sic] Chatbot, Automation of marketing processes and cloud & virtualization." Moreover, Bank-4 understood that the defendant's "current customers" included "Global X, Google, [and] Apple." In addition, in order to optimize his account, the defendant provided to Bank-4 falsified bank statements that purportedly reflected VC Innovated's account information at Bank-3. In reality, those bank statements were doctored versions of the bank statements for Sun Technologies—not VC Innovated—and contained the account number and information for Sun Technologies. (Compl. ¶ 14(f)).

In addition, in covertly recorded conversations, the defendant explained why he made misrepresentations to U.S. financial institutions. Specifically, in or about October 2023, the defendant had several recorded conversations with an undercover law enforcement officer ("UC-

1"), who the defendant believed needed to liquidate a large amount of USDT. The defendant explained to UC-1 that he used satellite companies—*i.e.*, one of his Shell Companies—to remit payments because banks tend to deny transfers or close accounts when the banks learn that the defendant is working with cryptocurrency-friendly banks. In another recorded conversation in or about December 2023, the defendant explained to UC-1 that his companies "basically do cryptocurrency," but that he does not disclose that to banks because banks would close his accounts. The defendant further explained that he creates a new company and does business under that name to avoid having his bank accounts closed. (Compl. ¶ 28).

Using this network of U.S.-based shell companies and corresponding bank accounts, the defendant helped the Network launder hundreds of millions of dollars through the U.S. financial system. (Compl. ¶¶ 18-25).

## PROCEDURAL BACKGROUND

On February 20, 2024, a five-count criminal complaint was filed in the Southern District of New York charging the defendant with (i) conspiracy to commit money laundering; (ii) money laundering; (iii) bank fraud; (iv) operation of an unlicensed money transmitting business; and (v) engaging in a monetary transaction in property derived from specified unlawful activity. (Dkt. No. 1). The defendant was arrested on February 22, 2024, in Miami, Florida and was presented the next day before Magistrate Judge Jonathan Goodman of the U.S. District Court for the Southern District of Florida.

On March 7, 2024, a grand jury returned a six-count superseding indictment (the "S2 Indictment") charging the defendant and five others with various crimes including, as relevant to the defendant: (i) conspiracy to commit money laundering from at least in or about May 2023 to at least in or about November 2023, in violation of 18 U.S.C. § 1956(h); (ii) money laundering since at least in or about January 2020, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2; (iii)

bank fraud since at least in or about January 2020, in violation of 18 U.S.C. §§ 1344 and 2; (iv) engaging in a monetary transaction in property derived from specified unlawful activity on or about August 22, 2023, in violation of 18 U.S.C. §§ 1957 and 2; and (v) operation of an unlicensed money transmitting business since at least in or about January 2020, in violation of 18 U.S.C. §§ 1960 and 2.  (Dkt. No. 16 (the "S2 Indictment")).

On April 25, 2025, the defendant moved to dismiss Counts Two, Three, and Four of the S2 Indictment ("S2 Motion to Dismiss"), arguing that the charges were legally defective. (Dkt. No. 87 ("S2 Def. Mot.")). The Government opposed the defendant's motion arguing, among other things, that the charges in the S2 Indictment tracked the relevant statutes and the defendant's conduct fell squarely within the prohibitions of those statutes. (Dkt. No. 88, ("Gov't S2 Opp.")).

On July 28, 2025, the grand jury returned the S4 Indictment charging the defendant in five counts: conspiracy to commit money laundering with narcotics trafficking as the specified unlawful activity ("Count One"); money laundering with narcotics trafficking as the specified unlawful activity ("Count Two"); money laundering with bank fraud as the specified unlawful activity ("Count Three"); bank fraud ("Count Four"); and operating an unlicensed money remitting business ("Count Five").  (Dkt. No. 125, ("S4 Indictment")).

## ARGUMENT

### I.    The Court Should Deny the Defendant's S4 Motion to Dismiss Counts Three and Four

The defendant now moves to dismiss Counts Three and Four of the S4 Indictment on the basis that the S4 Indictment's allegations are legally defective. As discussed below, the charges track the relevant statutes and the defendant's alleged misconduct falls squarely within what these statutes prohibit.

### A.      Applicable Law

The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).[3]   The dismissal of an indictment is an "extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *De La Pava*, 268 F.3d at 165.

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Vilar*, 729 F.3d 62, 80 n.16 (2d Cir. 2013) (quoting Fed. R. Crim. P. 7(c)(1)).   To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008). Only in "very rare cases," such as those involving a refusal to answer questions before Congress, must an indictment specify "how a particular element of a criminal charge will be met." *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) (distinguishing the special case of *Russell v. United States*, 369 U.S. 749 (1962)). Otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Id.* at 124 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also Yannotti*, 541 F.3d at 127.

---

[3] Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

On a pretrial motion to dismiss pursuant to Fed. R. Crim. P. 12(b), the allegations of the indictment must be taken as true. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). This is the case not just as to the charges themselves, but as to "all of the allegations of the indictment," and "[c]ontrary assertions of fact by the defendant will not be considered." *Id.* A reviewing court must also deem the indictment "to include facts which are necessarily implied by the specific allegations made." *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007), *cert. denied*, 552 U.S. 1242 (2008). Where a defendant has been given sufficient notice of the charges against him by means of, for example, a criminal complaint or discovery, prejudice will not have been shown, and the indictment should stand. *See, e.g.*, *Stringer*, 730 F.3d at 124-25 ("[Defendant] was sufficiently informed to defend against the charges and to be protected against the risk of double jeopardy" where the government provided a criminal complaint that "outlined his crimes in detail" and disclosed his victims' names in advance of trial); *Yannotti*, 541 F.3d at 127 (finding defendant was "well aware of the government's theory of the loansharking conspiracy" and the identities of victims and co-conspirators through the indictment and discovery); *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999) ("[W]here the indictment has been found even minimally sufficient, a court may look to the record as a whole in determining whether the defendant is protected from double jeopardy in a subsequent prosecution and whether the defendant has had an adequate opportunity to prepare his defense.").

Moreover, it is well settled that, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial"—which it has not done here—a facially valid indictment is not subject to challenge based on the quality or quantity of evidence. *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998); *see United States v. Williams*,

504 U.S. 36, 54 (1992); *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009).  This rule exists

because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the

defendant with the specific crime with which he is charged, allow him to prepare his defense, and

protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007).

Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy

the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021).

Rather, "[t]hat is something [courts] do after trial." *Id*.  This is consistent with the well-established

principle that summary judgment proceedings "do[] not exist in federal criminal procedure." *Id*.

In short, dismissal of an indictment is a "drastic remedy that should be utilized with caution

and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018).

### B.    Count Four Sufficiently Alleges a Scheme to Defraud

Given that the bank fraud charged in Count Four is the predicate offense for the money

laundering offense charged in Count Three, the Government first addresses the sufficiency of

Count Four. The defendant seeks to dismiss this charge on the basis that the defendant's scheme

does not involve obtaining a "traditional property interest." (S4 Def. Mot. at 1, 4).  However, this

count tracks the relevant statutory language, which requires denial of the motion based on the four

corners of the Indictment alone. *See Yannotti*, 541 F.3d at 127. The defendant, eliding this issue

entirely, instead anticipates and prospectively challenges potential theories that the Government

*could* advance at trial, without grappling with the legal standard applicable to a motion to dismiss.

The defendant argues in his motion that Count Four must be dismissed because: (i) it is premised

on the "right-to-control" theory of wire fraud that was rejected by the Supreme Court in *Ciminelli

v. United States*, 598 U.S. 306 (2023); (ii) use of one's own bank account cannot constitute

deprivation of property; and (iii) the additional services and reduced fees the defendant received

from the relevant financial institutions as a result of his misrepresentations were not the object of

his fraud but were purportedly merely an "incidental byproduct." (S4 Def. Mot. at 5-21). These arguments are legally and factually meritless and premature, and the Court should deny the defendant's motion to dismiss Count Four.

       1.     Count Four Alleges a Scheme to Obtain Property Under a Bank's Control

Count Four alleges a scheme to obtain "moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises." (S4 Indictment ¶ 5). It likewise includes a detailed "to wit" clause explaining that the defendant made false representations to banks about the nature of his businesses and how he would use his accounts, submitted fake documents to obtain additional banking services, and made false representations and omitted material facts about the nature and purpose of transactions to circumvent the bank's anti-money laundering systems and monitoring programs. (*Id.*) Because paragraph 5 of the S4 Indictment tracks the statutory language of 18 U.S.C. § 1344, it properly alleges that the defendant's scheme was to obtain "property" in violation of the bank fraud statute. *See Yannotti*, 541 F.3d at 127.

The defendant argues that the Government's theory "is possibly one prohibited by *Ciminelli*" based on the defendant's mistaken premise that the Government intends to advance the argument that the "property" alleged to have been obtained was the bank's "right to control" its asset, which is no longer a viable theory of "property" under *Ciminelli*. (S4 Def. Mot. at 11-20). The defendant separately speculates that, to the extent the Government intends to argue that the property interest is in fact a bank's regulatory interest, that is also not a cognizable interest under *Ciminelli.* (S4 Def. Mot. at 20).

*Ciminelli* rejected the "Second Circuit's 'right to control' theory, under which the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic

decisions." *United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 309 (S.D.N.Y. 2023). *Ciminelli* has no bearing on the bank fraud charge here, which alleges a scheme to obtain "money, funds, credits, assets, securities, and other property" in the bank's custody, and not a scheme to defraud the bank by depriving it of valuable economic information, as the defense mistakenly asserts. *See also Ciminelli*, 598 U.S. at 317 (Alito, J., concurring) ("I do not understand the Court's opinion to address fact-specific issues on remedy outside the question presented, including: (1) petitioner's ability to challenge the indictment at this stage of proceedings; (2) the indictment's sufficiency . . . ."); *United States v. An*, 733 F. Supp. 3d 77, 91 (E.D.N.Y. 2024) ("*Ciminelli* concerned an "instructional error, not the sufficiency of an indictment."). As discussed further below, the S4 Indictment's detailed "to wit" clause is fully consistent with the Government's theory that the banks were deprived of traditional property rights: it specifies, among other things, that funds were transmitted out of the defendant's accounts as a result of the defendant's false representations and material omissions, including the defendant's efforts to circumvent a bank's anti-money laundering systems and monitoring programs to "send[] hundreds of millions of dollars of transactions." (S4 Indictment ¶ 5).

In an attempt to shoehorn in *Ciminelli*, the defendant cites *Russell* for the (incorrect) principle that the S4 Indictment must do more than track the relevant statute. This attempt is unavailing. *Russell* is a six-decade-old decision that the Second Circuit has characterized as "one of the very rare cases in which an indictment that tracked the statutory language and furnished the pertinent dates was held insufficient." *Stringer*, 730 F.3d at 125. As the Second Circuit explained in cabining that opinion, *Russell* addressed the "special nature of a charge of refusal to answer questions in a congressional inquiry" and should not be construed "as a broad requirement applicable to all criminal charges that the indictment specify how each essential element is met."

*Stringer*, 730 F.3d at 125-26 ("[F]or certain statutes specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment, but there is no such universal requirement."); *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017) (distinguishing *Russell* and finding "no basis to depart from the usual sufficiency framework").  The defendant does not cite any legal authority for the proposition that *Russell*'s enhanced pleading requirements are applicable in the bank fraud context, even post-*Ciminelli*, and the Government is aware of none.

To the contrary, in the context of bank fraud, courts in this Circuit have routinely found indictments to be sufficient so long as they track the language of the statute. *See, e.g.*, *United States v. Kwok*, No. 23 CR. 118 (AT), 2024 WL 1407057, at *9 (S.D.N.Y. Apr. 2, 2024) ("[A]n indictment sufficiently states a bank fraud conspiracy offense where it alleges that the defendant conspired to send false information to a financial institution to disguise the true nature of an account and to obtain funds from that account that were in the custody and control of the financial institution."); *United States v. Motovich*, No. 21 CR. 497 (WFK), 2024 WL 2943960, at *4 (E.D.N.Y. June 11, 2024) ("The Bank Fraud Counts plainly track the language of the applicable underlying statute and state the time and place of the alleged bank fraud offenses and incorporate the Indictment's further factual allegations of Defendants' alleged scheme, thereby properly stating offenses under Federal Rule of Criminal Procedure 7(c)."); *Bankman-Fried*, 680 F. Supp. 3d at 305 ("Count Nine tracks the statutory language of Section 1344(2) and sufficiently alleges that the defendant conspired to obtain 'money or property' in violation of the statute.").

Moreover, while the defendant is critical of the Government's decision to seek a legally sufficient indictment that tracked the language of the statute, rather than a lengthier speaking

indictment (S4 Def. Mot. at 15-16), "[i]t is not the function of an indictment to inform the defendant of the evidence or the facts which the Government will use to prove its case." *United States v. Phillips*, 690 F. Supp. 3d 268, 277 (S.D.N.Y. 2023).  In fact, "the Government need not show its hands before trial because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged." *Id.*; Fed. R. Crim. P. 7(c)(1).

In a last-ditch effort to dismiss a portion of Count Four, the defendant asks the Court to make a factual determination: that the additional banking services the defendant sought to obtain through fake documents were an "incidental byproduct" of his fraud rather than its object. (S4 Def. Mot. at 20-21).[4] However, as the Court knows, at this stage, the allegations in the S4 Indictment "must be taken as true." *See Boyce Motor Lines*, 342 U.S. at 343 n. 16 ("This case is here to review the granting of a motion to dismiss the indictment. It should not be necessary to mention the familiar rule that, at this stage of the case, the allegations of the indictment must be taken as true."); *See United States v. Navarro*, 551 F. Supp. 3d 380, 388 (S.D.N.Y 2021) ("On a Rule 12(b) motion to dismiss an indictment, the Court accepts the allegations in the indictment as true and may not consider the sufficiency of the evidence."). Therefore, as alleged in the S4 Indictment, the defendant's deception about his business operations to obtain banking services and funds is an object of the defendant's fraud and sufficient to allege an offense at this stage.

Accordingly, because Count Four sufficiently alleges a bank fraud offense, the Court should deny the defendant's motion to dismiss that count on that basis alone.

---

[4] In the defendant's August 20, 2025 letter to the Court, the defendant recognized that this portion of the S4 Indictment "is arguably capable of satisfying the government's burden of alleging a traditional property interest." (Dkt. No. 133, at 3).

2.      A Customer's Account is Property Owned By the Bank

Ignoring clear legal precedent as to the applicable standard, the defendant separately argues that "merely opening an account based on false statements" is not sufficient to allege a deprivation of a traditional property right. (S4 Def. Mot. at 12-19). The defendant argues that that there is no controlling authority for this proposition and that it would be "an unwarranted extension of existing law." (S4 Def. Mot. at 12). But that is incorrect for two reasons: the S4 Indictment alleges that the defendant did more than open an account, and there is controlling authority to support a bank fraud charge on the basis of false statements used to open an account.

The S4 Indictment alleges that the defendant devised a scheme to obtain money or property from financial institutions by, among other things, falsely representing to various banks that the accounts would be used primarily for businesses involved in the software publishing or software development industries, knowing that they would instead be used to operate an unlicensed money remitting business related to an over-the-counter cryptocurrency exchange. (S4 Indictment ¶ 5). The S4 Indictment thus alleges that the defendant's scheme involved not only opening accounts but also continuing to use a financial institution's banking services under false pretenses to illegally operate an unlicensed money remitting business.

The Supreme Court in *Shaw v. United States*, 580 U.S. 63 (2016), is illustrative of precisely why the account activity described in the S4 Indictment invokes a traditional property interest. In *Shaw*, the Supreme Court found that once a "customer deposits funds" in the bank, "the bank, too, had property rights in" that account. *Id.* at 66. As the Court explained:

> When a customer deposits funds, the bank *ordinarily* becomes the owner of the funds and consequently has the right to use the funds as a source of loans that help the bank earn profits (though the customer retains the right, for example, to withdraw funds). *Sometimes*, the contract between the customer and the bank provides that the customer retains ownership of the funds and the bank merely assumes possession. But even then the bank is like a bailee, say, a

14

> garage that stores a customer's car. And as bailee, the bank can assert
> the right to possess the deposited funds against all the world but for
> the bailor (or, say, the bailor's authorized agent).

*Id.* (emphasis added). In other words, the *Shaw* Court recognized that banks *ordinarily* own funds deposited into bank accounts—such as the funds deposited into the bank accounts in question here—meaning that the financial institutions have a property interest wholly separate from that of the account owner. *See An,* 733 F. Supp. 3d at 92 (characterizing *Shaw* as recognizing that banks can at times "assert a property interest in the deposited funds against the depositor"). Accordingly, withdrawing or transmitting funds out of bank accounts as part of a scheme to defraud the banks is a deprivation of a traditional property interest: money.

The defendant—ignoring that the scheme involved more than opening an account—advocates for dismissal on the basis that "merely" opening an account based on false statements is not sufficient to "allege deprivation of a traditional property interest." (S4 Def. Mot. at 13). The defendant fails to cite any controlling authority for the proposition that obtaining a bank account from a bank through fraud does *not* implicate a bank's traditional property interests. Indeed, several courts in this Circuit have denied motions to dismiss indictments based on similar arguments that opening an account is insufficient to allege a violation of 18 U.S.C. § 1344. *See An*, 733 F. Supp. 3d at 93-94 ("[E]ven if it were established at trial that all the relevant funds and accounts belonged to the [defendants], that would not necessarily require dismissal because the victim banks generally would have had ownership or at least possessory interest in deposited funds and presumably would have profited from the accounts."); *Motovich*, 2024 WL 2943960, at *4 (finding indictment sufficiently alleged bank fraud where defendant used materially false representations to open bank accounts, deposited money into those accounts, and then explained how defendants used those funds); *Kwok*, 2024 WL 1407057, at *9 (finding indictment sufficiently alleged bank fraud where

it tracked the language of the statute and alleged that false representations were made to a financial institution to "open and maintain accounts used in furtherance of their fraud and obtain funds under the custody and control of those financial institutions."); *Bankman-Fried*, 680 F. Supp. 3d at 305 (finding indictment sufficiently alleged bank fraud conspiracy where the indictment "track[ed] the statutory language of Section 1344(2)" and alleged that the "defendant conspired to obtain 'money or property' in violation of the statute").

The defendant attempts to distinguish this case from *An*, *Motovich*, *Bankman-Fried*, and *Kwok* by resorting to the speaking allegations in the underlying indictments in those cases. (*See* S4 Def. Mot. at 15). But the principal of those cases is unchanged: there, as is the case here, the indictments were sufficient because the statutory allegations tracked the language of the statute. *See Kwok*, 2024 WL 1407057, at *9 (finding bank fraud count "legally sufficient" where it "tracks the language of the statute"); *Bankman-Fried*, 680 F. Supp. 3d at 305 (finding bank fraud count states an offense where it "tracks the statutory language of Section 1344(2)"); *Motovich*, 2024 WL 2943960, at *4 (finding bank fraud counts state offenses where they "plainly track the language of the applicable underlying statute"); *An*, 733 F. Supp. 3d at 90 ("[T]he Indictment sufficiently alleges a bank fraud scheme under the minimal standards required at this stage."). Accordingly, the S4 Indictment sufficiently states an offense because it, too, tracks the statutory language of 18 U.S.C. § 1344.

The defendant cites a single out-of-Circuit case from the Eastern District of Wisconsin as a "persuasive opinion" in support of his argument. (S4 Def. Mot. at 18-19). But that case is easily distinguished. In *United States v. Braeger*, the defendant opened a business checking account at a bank in the name of a company purportedly formed to invest in an energy plant in Uganda. No. 21 CR. 233, 2023 WL 2136722, at *1 (E.D. Wis. Feb. 21, 2023). The defendant then solicited

investors with a memorandum that contained misrepresentations and received a $100,000 check as a result, which he deposited into his business account. *Id.* The indictment alleged that the defendant obtained money from the bank after he deposited the victim's funds into his bank account. *Id.* The court reasoned that the bank's involvement was "wholly fortuitous—a function of the victim's paying the fraudster by (valid) check rather than cash." *Id.* at *5. In other words, the victims—not the financial institution—were the object of the defendant's fraud. The court dismissed the indictment after finding that setting up the business account did not induce the bank to later disburse funds that had been deposited into that account; rather it was just a step in a plot to defraud investors. *Id.* at *7. Here, the banks' involvement was not fortuitous—rather, as alleged, and as the evidence will show at trial—the banks were an integral part of the defendant's scheme to operate his unlicensed money remitting business, and the defendant knowingly lied to the banks regarding the nature of his business for the purpose of opening bank accounts the banks otherwise would not have opened and obtaining ongoing financial services that the banks otherwise would have discontinued.

Accordingly, the Court should deny the defendant's motion to dismiss Count Four.

### C.    Count Three Sufficiently Alleges an Offense

The defendant argues that Count Three should be dismissed because it is predicated on the bank fraud that is the subject of Count Four. Because the Court should deny the defendant's motion to dismiss Count Four, the Court should likewise deny the defendant's motion to dismiss Count Three.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the defendant's motion to dismiss should be denied in its entirety.

Dated:    New York, New York
          September 10, 2025

                                    Respectfully submitted,

                                    JAY CLAYTON
                                    United States Attorney
                                    Southern District of New York


                         By:    __/s/_____
                                    Jennifer N. Ong
                                    Eli J. Mark
                                    Assistant United States Attorneys
                                    (212) 637-2224 / -2431