

NEW JERSEY OFFICE
06 POMPTON AVENUE, SUITE 25
CEDAR GROVE, NJ 07009
(973) 239-4300

NEW YORK OFFICE
347 5TH AVENUE, SUITE 1402
NEW YORK, NY 10016
(646) 205-2259

LORRAINE@LGRLAWGROUP.COM
WWW.LGAULIRUFO.COM
FAX: (973) 239-4310

————

March 24, 2026

*Via ECF*
The Hon. Mary Kay Vyskocil
Daniel Patrick Moynihan Building
United States Courthouse
New York, NY 10007

Re: *United States v. Felipe Estrada Echeverry*
Docket No. S6 24-cr-133-04 (MKV)

Dear Judge Vyskocil,

This sentencing submission is offered on behalf of Felipe Estrada Echeverry ("Mr. Echeverry or "Felipe") who is scheduled to be sentenced by Your Honor on April 8, 2026. In light of the factors set forth in 18 USC § 3553(a), Mr. Echeverry respectfully requests that Your Honor impose a sentence of time served. Such a sentence is sufficient but not greater than necessary to satisfy the goals of sentencing.

### I. **Preliminary Statement**

Felipe Echeverry's life has been defined not by criminality, but by resilience, hardship, and an unwavering commitment to his family. Mr. Echeverry has endured profound challenges—from severe lifelong hearing impairment and childhood poverty to the responsibility of serving as the sole caregiver and provider for two ailing parents—yet he has lived a law-abiding life until this isolated offense. He has accepted responsibility, pled guilty, and has already served a substantial period of incarceration that, in practical terms, closely aligns with the sentence contemplated by Probation when accounting for good time credit and the realities of his immigration status. Further incarceration would serve little additional punitive or deterrent purpose, particularly given that he will be subject to immediate removal from the United States. Under these circumstances, a sentence of time served is sufficient, but not greater than necessary, to satisfy the purposes of sentencing under § 3553(a).

## II.  Procedural History

Mr. Echeverry was arrested on April 30, 2024 pursuant to a sealed indictment in Medellin, Colombia for his involvement in the instant offense and detained. Presentence Report ("PSR")  p. 1, Dkt. No. 9. He extradited to the United States for purposes of prosecution on May 16, 2025 and remanded to federal custody. PSR p. 1. On December 11, 2025, Mr. Echeverry appeared before Your Honor and pled guilty pursuant to a plea agreement to a one-count superseding information charging him with one count of operating an unlicensed money transmitting business in violation of 18 U.S.C. §§ 1960(b)(1)(C) and 2. PSR  ¶ 1. Mr. Echeverry's applicable advisory guideline range is 87-108 months imprisonment. PSR ¶ 115. However, the statutorily authorized maximum sentence is five years—less than the applicable guideline range. *Id*. Therefore, the applicable guideline term of imprisonment is 60 months. *Id*. The United States Probation Department has recommended a downward variance pursuant to 18 U.S.C. § 3553(a) to a below guideline sentence of 36 months. PSR p. 31. As of the date of his sentencing, Mr. Echeverry will have served just shy of 24 months imprisonment, 12 and a half of which were served in Medellin, Colombia. PSR p. 1.

## III.  Legal Standard

We recognize that the Court is well versed in the standards for federal criminal sentencing but reiterate the established contours for completeness. It is a fundamental principle of sentencing that a court "shall impose a sentence sufficient, but not greater than necessary" to meet the goals of sentencing. 18 U.S.C. § 3553(a). In sentencing a defendant, a district court must "begin [its] analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). However, a sentencing court "may not presume that the Guidelines range is reasonable." *Id*. at 50. As the Court is well aware, "the Guidelines are guidelines—that is, they are truly advisory," and hence this Court is "generally free to impose sentences outside the recommended range." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).

The system "requires a court to give respectful consideration to the Guidelines," but it "permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting *United States v. Booker*, 543 U.S. 220, 245-46 (2005)). "Although the Guidelines remain 'the starting point and the initial benchmark' for sentencing, a sentencing court may no longer rely exclusively on the Guidelines range; rather, the court 'must make an individualized assessment based on the facts presented' and the other statutory factors." *Beckles v. United States*, 137 S.Ct. 886, 894 (2017) (quoting *Gall*, 552 U.S. at 49-50) (internal citation omitted). "The Guidelines thus continue to guide district courts in exercising their discretion by serving as 'the framework for sentencing,' but they 'do not constrain th[at] discretion.'" Id. (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2084 (2013)).

## IV. Application of the Relevant § 3553(a) Factors Support Leniency for Felipe

A sentencing court is unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States*, 518 U.S. 81 (1996)). To conduct an individualized assessment, the Sentencing Reform Act provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. This right is fundamental to our sentencing process and has recently been affirmed by the United States Supreme Court. See *Concepcion v. United States*, 142 S.Ct. 2389, 2398-99 (2022) ("There is a 'long' and 'durable' tradition that sentencing judges 'enjo[y] discretion in the sort of information they may consider' at an initial sentencing proceeding.").

As contemplated by the Supreme Court, this Court's ability to consider all relevant information at the time of Mr. Echeverry's sentencing is critical to its ability to fashion a just sentence in his case. See *Pepper v. United States*, 562 U.S. 476, 488 (2011) ("Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will not suit merely the offense but the individual defendant."). Consistent with this principle, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors. See 18 U.S.C. § 3553(a)(1)-(7). Against the backdrop of these factors, Mr. Echeverry respectfully submits that a sentence of time served is appropriate in this case.

### a. Mr. Echeverry's History and Characteristics

### i. Growing up in Colombia

Mr. Echeverry was born and raised in a Catholic household in Medellin, Colombia. PSR ¶ 84-85. He was born prematurely and has suffered from significant hearing loss since birth. PSR ¶ 95. Despite undergoing multiple surgeries to attempt to fix his hearing loss, Felipe has only approximately 20 to 30 percent hearing in either ear and is only able to communicate by reading lips, in Spanish. *Id.*[1] His father was a chronic alcoholic and, at times, his family was unable to put food on the table. PSR ¶ 86, 88. While he never witnessed any violence between his parents, they ultimately separated when Felipe was approximately 13 years old because of his father's alcoholism and infidelity. PSR ¶ 88. Growing up, Felipe was teased a lot at school for his hearing aids—other children would hit him and take his hearing aids out to bully him. PSR ¶ 87. He spent much of his childhood alone, playing with Legos and video games. *Id*. On top of his hearing loss, Felipe was diagnosed with ADHD when he was a child.

While his family struggled for money, he was able to attend school thanks to his maternal aunt who lived in Spain—she paid for his school tuition. PSR ¶ 86. Because of his hearing loss and his ADHD, school was difficult for Felipe. PSR ¶ 103. Despite the challenges his faced, he earned his high school diploma in 2004. *Id*. He also went on to earn a bachelor's degree in business administration from Escuela de Administracion Fenanzas e Instituto Tecnologico. *Id*.

---

[1] While his hearing aids give him about 50 percent hearing, they are currently broken and, despite several attempts to get them fixed while incarcerated, the Bureau of Prisons at the Westchester County jail has not been able to help him. PSR ¶ 95.

While Felipe wanted to go on to study mechanical engineering, he knew it would be challenging to find a job given his hearing impairment, so he did not continue. PSR ¶ 103, 108.

Despite the discrimination in the job market he faced because of his disability, Felipe was determined to make a living. At age 16, he started to sell candy and sports cards at school to make extra money to help out at home. PSR ¶ 108. He also started his own promoting business and promoted concerts and events throughout the community. PSR ¶ 107-108. When he was older, he began to buy and sell cars, apartments, and land. PSR ¶ 108. Finally, for the approximate 10 years prior to his arrest, he was self-employed in the cryptocurrency trading field. PSR ¶ 106.

While Felipe has no children and never married, he has been with his partner, Johana, for approximately 17 years. PSR ¶ 90. They had plans to get married prior to his arrest. *Id*. While the separation has been incredibly difficult for her, he hopes they can resume their plans upon his return to Colombia.

### ii. Mr. Echeverry's family and friends hold him in high regard and his parents depend on him both physically and financially

Felipe's parents have written to Your Honor about how integral he is to their life and provide Your Honor with a picture of who he is. Raised in a strong Catholic household, Felipe has always been deeply committed to his family and has lived a respectful life. *See* Parent's Letter, attached hereto as Exhibit A. Growing up with a disability, Felipe had to work harder than his peers to learn to communicate but always "faced his limitations with effort and dignity." *Id*. His aunt, Maria Vargas, echoes his parents' sentiments and describes Felipe as an "honorable, honest person with strong principles." *See* Maria Vargas letter, attached hereto as Exhibit B. Maria admires Felipe's courage for overcoming adversity because of his disability, noting that he "transformed those experiences into admirable maturity." *Id*. Another one of his aunts, Beatriz, describes Felipe as having always "been respectful of his elders, a homebody, loyal, kind, and affectionate." *See* Beatriz Echeverry Letter attached hereto as Exhibit C.

Felipe's friends also know him to be a respectable man, and many have written to Your Honor to provide their insight into his character. A friend, Juan Palacio, knows Felipe to "a noble, compassionate person, deeply committed to the well-being of others." *See* Juan Guillermo Palacio Letter, attached hereto as Exhibit D. Another friend, Daniela Restrepo, recalls Felipe accompanying here through some important personal situations, including medical procedures, offering his genuine support as a friend you can count on. *See* Daniela Restrepo Letter, attached hereto as Exhibit E. Two of his friends from University, Samuel and Juan, recall that when they fell on hard financial times, Felipe and his family took both of them in, even though they barely had the means to support themselves. *See* Samuel Blanco Letter attached hereto as Exhibit F, and Juan Ramirez Letter, attachd hereto as Exhibit G.

As mentioned, Felipe's father suffered from alcoholism. As a result, he was unable to keep a steady job for the past 15 years and, in 2022, was diagnosed with cirrhosis of the liver. PSR ¶ 88. Felipe's mother, Laura, has also not been able to work for approximately 20 years as she suffers from an esophageal issue, sleep apnea, and high blood pressure. PSR ¶ 85. Despite

their separation, both of Felipe's parents moved back in with him in 2020 so he could care for them. PSR ¶ 88.  Felipe takes care of both of his parents physically and financially—he takes his mother to doctor's appointments, does the shopping for them, and ensures they are looked after. He has been the sole breadwinner for them, and since his arrest, he has been unable to provide financially, which has put a significant strain on his parents. PSR ¶ 92.

As is evident from the multiple letters provided to Your Honor, Felipe is the backbone of his family whom without they cannot survive. *See*, Exhibits A-G. His parents have had to take out loans to live in the meantime, and Felipe will ultimately be responsible for their repayment upon his return. Probation has indicated that Felipe's ongoing obligations to care for his family are mitigating factors they considered in fashioning their recommendation to Your Honor. PSR p. 32.

> iii. **Felipe's individual circumstances call for a sentence of time served, with no period of supervised release to follow, as he will be subject to removal immediately following his release from federal custody**

This is Mr. Echeverry's first and only brush with the law, as he has no criminal history whatsoever. While his conduct was certainly serious, it was non-violent in nature and he has taken responsibility for his actions and pled guilty before Your Honor. The tenant that a defendant's criminal conduct must be measured against his overall life has resonance in this case. The weighing of the good with the bad in Mr. Echeverry's life reveals that his criminal conduct should not provide the sole basis for judging his fate. Rather Felipe's life has been marked by not only overcoming adversity against all odds but doing so humbly and with the clear-minded intention of caring for his family by whatever means necessary. Case law supports the proposition that a defendant's history of good works supports a variance. See e.g., *United States v. Tomoko*, 562 F.3d 558, 569-71 (3d Cir. 2009) (en banc) (where defendant was convicted of tax evasion of $255,000 and faced a guideline sentence of 12-18 months, district court's sentence to probation on condition of one year home detention was not unreasonable because of his "negligible criminal history, his employment record, his community ties, and his extensive charitable works");  see also *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (similar).

Further, as recommended by Probation, a term of supervised release is not warranted in this case. Mr. Echeverry has an ICE detainer that was lodged against him upon his extradition to the United States. PSR ¶ 91. Because he will be subject to removal proceedings upon his release from federal custody a term of supervised release would not be practicable. PSR p. 32.

> b. **The Need for the Sentence Imposed...**

> > i. **To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

A sentence of time served adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. Mr. Echeverry, for the first time, has a felony

conviction on his record. This Court should consider the significant punishment resulting from the collateral consequences Mr. Echeverry will now face as a result of this conviction. A congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. See GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, Stakeholders View on Potential, Actions to Address Collateral Consequences, (Sept. 2017). Of these collateral consequences, 497, or 78% of them, may last a lifetime. *Id*.

Recognizing the effect of collateral consequences on a felony conviction, one district court has emphasized the need for federal judges to account for such impact at sentencing. *United States v. Nesbeth*, Case No. 1:15-cr-18, 2016 (WL 3033073) at *1 (E.D.N.Y. May 24, 2016) (Block, J.) (varying downward from a guideline range of 33-44 months imprisonment to one year probation from a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). As Nesbeth establishes, the civil death that Mr. Echeverry will face due to his conviction, even in Colombia, constitutes significant punishment. See also, Wayne A. Logan, Informal Collateral Consequences, 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave").

Secondly, Mr. Echeverry has been detained for nearly 24 months, 12 and a half of which were in horrific conditions in Medellin, Colombia. While incarcerated in Medellin awaiting extradition, he often went up to four days without food or water. Due to overcrowding in the jail, he was shoved in a two-person cell with five or 6 other people. There were often rats and other rodents that made themselves at home in their crowded cell, and, needless to say he was often denied medical care. Since his extradition, he spent most of his time in custody at the Westchester County Jail but has recently been transferred to MDC Brooklyn, where conditions range from dangerous to downright inhumane, as this Court is surely aware. The persistent lockdowns, medical neglect, lack of inmates' access to safe food and water, and lack of inmates' access counsel has been so severe the past several years, some judges in this district have specifically indicated on the record at sentencing that under no circumstances should a defendant be designated there. *See* Englemayer, J., *United States v. Frankie Villanueva*, 24-cr-466 (PAE) Sent. Tr. At 60 (noting on the record that, were the defendant to be designated to MDC, his Honor would immediately entertain a motion for compassionate release).

Further, Mr. Echeverry has been in fear for his safety since arriving in the United States because of his hearing aids. Other inmates in the jail believe that Mr. Echeverry's hearing aids are not medical aids at all—they believe he is a confidential informant that has been given recording devices by law enforcement to spy on other inmates. While Mr. Echeverry has tried to explain that he needs these to help him hear, his limited English along with his hearing loss make it difficult for him to effectively communicate. As a result, he has spent a lot of his time in isolation.

Lastly, a time served sentence is not completely out of line with Probation's recommendation of 36 months imprisonment, accounting for good time credit. With good time

credit[2], defendants typically serve approximately 85 percent of their sentence, and often have the chance to transition to a halfway house approximately six months prior to their release. As of the date of sentencing, Mr. Echeverry would have served just shy of 24 months, or approximately 66 percent of a 36-month sentence. Given that Mr. Echeverry will certainly be awarded good time credit due to his lack of disciplinary infractions, he would likely be scheduled to be released approximately 6 months from sentencing, or after serving 30 months of a 36-month sentence. But for his immigration status, the BOP would likely release him to a transitional halfway house 6 months prior to that, a date which would coincide with the date of sentencing.

In other words, were Your Honor to follow Probation's recommendation and sentence him to 36 months imprisonment and he were an American citizen not facing imminent deportation, he would likely be released to a halfway house shortly after the date of sentencing. Because he has an ICE detainer, he will be remanded to ICE custody upon release from federal custody. Mr. Echeverry did not come here illegally, he was extradited for the purposes of prosecution and should not be penalized because of his involuntary illegal status here. A sentence of time served would be largely in line with Probation's recommendation, mitigating any negative consequences he would face as a result of his immigration status and ineligibility for transition to a halfway house.

### ii. **To afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant**

A sentence of time served followed by a term of supervised release also affords adequate deterrence, both general and specific, and serves to protect the public.

### 1. **General deterrence**

The principle of general deterrence is based on the premise that lengthy prison sentences deter crime. Not surprisingly then, prosecutors consistently argue the factor of general deterrence in support of guideline sentences. And why not? If you consistently assert that prison sentences are not only necessary to punish the Defendant but also needed to prevent crimes, then you gain strong support for guideline sentences that nearly always require imprisonment. The troubling aspect of this is that it is wrong and has led to mass incarceration. *See* Dr. Oliver Roeder et al., *What Caused the Crime Decline?*, Brennan Center for Just., 22-23 (Feb. 12, 2015).

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id*; *see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes that "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between punishment levels and perceptions of punishment levels appears to be weak to nonexistent." *Id*. at 1031. Perhaps, what is even more troubling about a federal prosecutor's embrace of general deterrence is that such a posture contradicts their employer's perspective on the matter. Indeed, the United States Department of

---

[2] Mr. Echeverry has incurred no disciplinary infractions since his incarceration. PSR ¶ 8.

Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, Five Things About Deterrence (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. See *id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963) ("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

### 2.  Specific deterrence

Having established that prison sentences, regardless of length, have no impact on general deterrence, this section demonstrates that the factor of specific deterrence also supports Mr. Echeverry's request for a variance. The first part of this section focuses on studies establishing that incarceration has no effect on recidivism. The second part asserts that Mr. Echeverry's history and characteristics prove that he will never commit another crime.

### 3.  The relationship between incarceration and recidivism

As in the case of general deterrence, empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. See National Institute of Corrections, Myths and Facts, *Why Incarceration is Not the Best Way to Keep Communities Safe* (2016). To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than non-custodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* 91 Prison J. 48S, 50S-51S (2011). There is compelling evidence that prison—by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders—leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974- 2002*, 6 Criminology & Public Policy 589 (2007). *See also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887) ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections.

### 4.  Mr. Echeverry's lower risk of recidivism

The likelihood that the defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper*, 562 U.S. at 492. Other than the instant offense, Mr. Echeverry has no criminal history to speak of. Further, he is educated and is approaching 40 years of age. Moreover, he will almost certainly be deported after he serves this sentence, thereby mitigating any potential risk he poses to the community. He poses an extremely low risk of recidivism. See U.S. Sent. Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004) (citing

older age, educational attainment, and lack of criminal history as markers of low recidivism risk).

> iii. **To provide the defendant with needed educational or vocational skills, medical care, or other correctional treatment in the most effective manner**

Felipe graduated high school in 2004 and obtained a bachelor's degree in business administration from an institution in Medellin, Colombia despite the significant barriers he has faced with his hearing loss and his diagnosed ADHD. PSR ¶ 103. As such, the Bureau of Prisons would not be able to supply him with any additional beneficial educational opportunities. Furthermore, continued custody would likely inhibit his ability to access adequate care for his hearing loss. His hearing aids are not working properly, and he has made multiple requests to the staff at the Westchester County jail where he is incarcerated for replacements. PSR ¶ 95. These requests were documented in his medical records provided to the probation department and, as of January 2026, his requests have not been answered. *Id*. Continued custody would only delay Mr. Echeverry's ability to access necessary resources to repair or replace his hearing aids.

### c. The Need to Provide Restitution to Any Victims of the Offense

Restitution is not an issue in this case.

## V. Conclusion

For the reasons set forth above, it is respectfully requested that this Court impose upon Mr. Echeverry a sentence of time served. Such a sentence is sufficient but not greater than necessary to satisfy the goals of sentencing.

Respectfully submitted,

*Lorraine Gauli-Rufo*

Lorraine Gauli-Rufo, Esq.
*Attorney for Felipe Estrada Echeverry*

cc: Jennifer Ong, AUSA
    Eli Jacob Mark, AUSA