UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                    No. 24-cr-00133-MKV

MAXIMILIEN DE HOOP CARTIER,

Defendant.

**SENTENCING SUBMISSION ON BEHALF OF MAXIMILIEN DE HOOP CARTIER**

Kathleen E. Cassidy
Katri Stanley
Chloe Lewis
Kayasha Lyons
MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
(212) 856-9494 (facsimile)

*Counsel for Defendant*
*Maximilien de Hoop Cartier*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................ 1

    I.    MR. DE HOOP CARTIER'S STORY .................................................................. 3

          A.    Early Life and Upbringing ........................................................................... 3

          B.    Mr. de Hoop Cartier's Experience at HOSTA ........................................... 5

          C.    Mr. de Hoop Cartier's Early Career Experiences ...................................... 7

          D.    Mr. de Hoop Cartier's Desire for Change and his Return to Argentina ..... 8

          E.    Mr. de Hoop Cartier's Next Steps, Return to Europe, and Plans for the Future ....................................................................................................... 11

          F.    The Offense Conduct ................................................................................. 14

    II.    SENTENCING DISCUSSION ........................................................................... 19

          A.    Applicable Legal Standard ......................................................................... 19

          B.    The Advisory Guidelines Calculation ....................................................... 20

          C.    Application of the § 3553(a) Factors Supports a Sentence Reflecting a Significant Downward Variance ............................................................... 21

              1.    Mr. de Hoop Cartier's Role in the Offense and the Nature of the Conduct Warrants a Sentence Reflecting a Significant Downward Variance ........................................................................................... 21

              2.    A Sentence Without Significant Future Prison Time Avoids Unwarranted Sentence Disparities ................................................... 25

              3.    The Sentencing Guidelines Range Does Not Properly Reflect Mr. de Hoop Cartier's Culpability When Considering the 18 U.S.C. § 3553(a) Factors ............................................................................... 30

              4.    Mr. de Hoop Cartier Has Already Experienced Serious Consequences and Is Remorseful ................................................... 33

5.  Significant Further Prison is Not Necessary to Achieve General or Specific Deterrence in This Case ............................................................... 37

6.  A Sentence Reflecting a Significant Downward Variance Would be Sufficient Punishment for Mr. de Hoop Cartier; the Alternative Would be Greater Than Necessary to Fulfill the Aims of Punishment ..................... 39

III.   THE COURT SHOULD NOT IMPOSE A FINE ......................................................... 41

CONCLUSION ................................................................................................................. 41

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Gall v. United States*,
  552 U.S. 38 (2007) ....................................................................................................... 20

*Koon v. United States*,
  518 U.S. 81 (1996) ......................................................................................................... 3

*Murgio v. United States*,
  2024 WL 4850812 .................................................................................................. 32, 33

*U.S. v. Hodges*,
  No. 07-cr-706 (CPS), 2009 WL 366231 (E.D.N.Y. Feb. 12, 2009) ........................... 38

*United States v. Adelson*,
  441 F.Supp.2d 506 (S.D.N.Y. 2006) .......................................................................... 32

*United States v. Blarek*,
  7 F. Supp. 2d 192 (E.D.N.Y. 1998) ............................................................................ 20

*United States v. Booker*,
  543 U.S. 220 ............................................................................................................... 18

*United States v. Carty*,
  264 F.3d 191 (2d Cir. 2001) ....................................................................................... 33

*United States v. Chavez*,
  710 F. Supp. 3d 227 (S.D.N.Y. 2024) ........................................................................ 34

*United States v. Colucci*,
  743 F. Supp. 3d 452, 2024 WL 3643857 .................................................................... 34

*United States v. Dorvee*,
  616 F.3d 174 ............................................................................................................... 20

*United States v. Gallego*,
  No. 95-CR-0284 (LAK), 2025 WL 723237 (S.D.N.Y. Mar. 6, 2025) ....................... 39

*United States v. Gupta*,
  904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................................................ 32

*United States v. Marshall*,
  No. 16 Cr. 702 (PAE), 2024 WL 4785068 (S.D.N.Y. Nov. 14, 2024) ...................... 33

iii

*United States v. Mateo*,
    299 F. Supp. 2d 201 (S.D.N.Y. 2004) ...................................................................... 39

*United States v. Maxwell*,
    118 F.4th 256 (2d Cir. 2024) ................................................................................... 19

*United States v. McCarthy*,
    No. 22-cr-491, 2023 WL 3741996 (E.D.N.Y. May 30, 2023) ................................... 39

*United States v. Nunez*,
    No. 23 Cr. 517 (AT), 2024 WL 4504493 ................................................................. 34

*United States v. O'Berry*,
    No. 18 Cr. 277 (PAE), 2024 WL 5244936 (S.D.N.Y. Dec. 30, 2024)........................ 33

*United States v. Santana*,
    No. 22-cr-368 (VM), 2024 WL 2275037 (S.D.N.Y. May 20, 2024) ......................... 35

*United States v. Thavaraja*,
    740 F.3d 253 (2d Cir. 2014) .................................................................................... 41

**Statutes**

18 U.S.C. § 371........................................................................................................... 2, 21

18 U.S.C. § 1960(b)(1)(A)............................................................................................ 2, 21

18 U.S.C. § 3553(a)(2)(B), (C) .................................................................................... 37, 38

18 U.S.C. §§ 1960(b)(1)(A) and (b)(1)(B) ...................................................................... 18

**Rules**

U.S.S.G § 2S1.3 .............................................................................................................. 30

**Other Authorities**

*Twenty-First Century: A Review of the Evidence*,
    42 Crime & Justice 199 (2013)................................................................................ 39

**PRELIMINARY STATEMENT**

This memorandum is submitted on behalf of Defendant Maximilien de Hoop Cartier, who is scheduled to be sentenced by Your Honor on April 23, 2026.  Although the Court has supervised this case since the time of Mr. de Hoop Cartier's arrest, this is his first real opportunity to speak directly to the Court, and to share with the Court certain facts about his conduct that have not been addressed in the charging documents or in the limited motions practice that occurred before Mr. de Hoop Cartier's plea.  We present these facts and the arguments below on Mr. de Hoop Cartier's behalf, not to diminish his acceptance of responsibility, but to situate the facts of his crimes in the context of his whole life, and to present to the Court certain aspects of the case that may be unfamiliar, and that the Court may find relevant to its sentencing determination.

For the reasons set forth herein, we respectfully request that the Court sentence Mr. de Hoop Cartier, who has been incarcerated for the two plus years since his arrest in February 2024 and at the Metropolitan Detention Center in Brooklyn since June 2024, to a sentence significantly below the sentences recommended by the Guidelines and Probation. These recommendations do not give sufficient weight to the mitigating facts discussed herein that bear on the § 3553(a) factors and that we respectfully suggest the Court should consider in arriving at the sentence "sufficient but no greater than necessary" to fulfill the goals of sentencing.

Mr. de Hoop Cartier is a 58-year old Argentine citizen with no previous criminal record. From approximately 2018 through February 2024, he operated an unlicensed money transmitting business through which he conducted significant volumes of cryptocurrency transactions on behalf of an array of clients.  In connection with opening accounts in the United States that received the proceeds from those transactions, Mr. de Hoop Cartier made misrepresentations to certain banks as to the nature of his business in order to avoid these banks' restrictions on

1

cryptocurrency.  For this conduct, Mr. de Hoop Cartier pled guilty to two offenses: operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(b)(1)(A) and conspiracy to commit bank fraud in violation of 18 U.S.C. § 371, each of which carries a maximum five-year sentence.

Other individuals charged by the government and previously part of the same Indictment have been implicated in a broader scheme to knowingly launder narcotics proceeds or to transport narcotics to the United States.  In contrast, Mr. de Hoop Cartier had no knowledge of any narcotics-related conduct and the government has not shown that he knowingly or intentionally aided any narcotics-related activity.  In fact, the evidence shows that Mr. de Hoop Cartier made efforts to try to verify the identities of his clients, and made many, albeit admittedly insufficient, attempts to conduct his crypto business lawfully, including by engaging with outside companies to conduct Know-Your-Customer ("KYC") diligence and working with exchanges that provided additional checks on the transactions he undertook.

Mr. de Hoop Cartier does not seek to deny responsibility for his offenses – he operated a money services business without the proper licenses and registration, and misled banks about the nature of the business he was operating, and that is what he pleaded guilty to.  He did not plead guilty to money laundering, nor to the provision of the unlicensed money transmittal statute that Mr. Estrada Echeverry pleaded guilty to, which requires as an element that the funds "are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."  18 U.S.C. § 1960 (b)(1)(C).  However, he now understands that his conduct enabled people who were laundering narcotics proceeds to use his accounts for their purposes, and he immensely regrets that his conduct facilitated such transactions.  His efforts to run a fledgling cryptocurrency business, essentially on his own,

2

cutting corners at times and making poor decisions in ways that ran afoul of U.S. criminal law, have led to disastrous life-changing consequences for Mr. de Hoop Cartier.  He has spent nearly two years in the abysmal conditions at the MDC, and he has lost the entirety of his life savings. At 58, he finds himself alone, incarcerated in a foreign country, with no family and only a few friends, and no financial resources.  As a citizen of Argentina, he will be deported at the conclusion of his incarceration.  Mr. de Hoop Cartier has learned the very real and severe consequences of breaking U.S. law and will never do so again.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  In this submission, we endeavor to provide the Court with additional context for Mr. de Hoop Cartier's crime, the nature of who he is outside of the offense conduct, and to explain what he has already lost as a direct result of his actions, including years of his life, a promising singing career, and a path to permanent residency in his chosen country, France.

## I.   MR. DE HOOP CARTIER'S STORY

### A.  Early Life and Upbringing

Maximilien de Hoop Cartier, now 58 years old, was born in Buenos Aires, Argentina on November 18, 1967.  He grew up in Buenos Aires in a financially comfortable household.  But the material comforts of his home life could not make up for a lack of emotional warmth in his household, and Mr. de Hoop Cartier remembers his house being an empty, lonely place.  His father, Daniel de Hoop, who ran a large stationary distribution business and worked in real estate, was often gone.  His mother, Sara Cartier, helped Mr. de Hoop Cartier's father with his affairs

and performed philanthropic work, but was similarly absent from the household.  Mr. de Hoop Cartier describes her as a cold and difficult person who showed him little affection.

Also present in the home were Mr. de Hoop Cartier's half-brother, who is ten years his senior, and a brother who is five years older than Mr. de Hoop Cartier.  His half-brother is Mr. de Hoop Cartier's mother's son from a previous relationship.  Though his half-brother was the first person to introduce Mr. de Hoop Cartier to music, Mr. de Hoop Cartier has only a few memories of him because his mother kicked him out of the house when he was 16 (and Mr. de Hoop Cartier was 6), and they never connected again later in life.  It is Mr. de Hoop Cartier's understanding that he lived in Vancouver at one point, but that he has since returned to Buenos Aires and holds a doctorate in ecology and biology and is a professor at a university.

Mr. de Hoop Cartier is similarly estranged from his middle brother who left the family home at age 18, when Mr. de Hoop Cartier was 13.  He saw him only sporadically after that, and then they fell out around the time of his father's death from metastatic prostate cancer in 2000 at the age of 75.  Mr. de Hoop Cartier attempted to reconcile with his brother about ten years later, but the interaction quickly soured.  They never spoke again.  After a period of estrangement, Mr. de Hoop Cartier improved his relationship with his mother in the years leading up to her death from Alzheimer's in 2019 at age 85.  After his mother's passing, his brother assumed control of their late father's businesses, which their mother had inherited after his death, as well as of their childhood home, which he sold to a large real estate developer.  Despite the considerable size of his parents' estate, Mr. de Hoop Cartier got nothing.  Mr. de Hoop Cartier chose not to contest the questionable circumstances under which his brother had taken control of the inheritance.

Mr. de Hoop Cartier attended primary and middle school at Belgrano Day School in Buenos Aires and switched for high school to a French school called Institut Grand-Bourg, from

4

which he graduated.  Though Mr. de Hoop Cartier played rugby in his youth, and developed a lifelong passion for the sport, Mr. de Hoop Cartier recalls having been bullied in primary school due to his slender frame.  This encouraged Mr. de Hoop Cartier to work on his physique in his teenage years and he became interested in weight training, a hobby that continued well into adulthood.

Mr. de Hoop Cartier's negative experiences at home and at school left him with the feeling that he would be happier elsewhere, with a fresh start, outside of Argentina.  That is exactly what he did at the first chance he got.  Upon graduating from high school at 18 or 19, Mr. de Hoop Cartier left Argentina to join a friend living in the town of Marbella in the south of Spain.  But after six months in Marbella, Mr. de Hoop Cartier's mother called him and said he should pursue further studies, and that she would agree to pay for it.  Mr. de Hoop Cartier decided to enroll in HOSTA[1], a hotel management and tourism school in Leysin, Switzerland, near the famed lakeside town of Montreux and at the foothills of the Alps.  Selecting HOSTA turned out to be one of the best decisions of his life.

### B.  Mr. de Hoop Cartier's Experience at HOSTA

Mr. de Hoop Cartier arrived in Geneva, Switzerland from Spain with only the clothes on his back and a general idea of how to get to Leysin.  His mother had arranged for him to stay initially at the home of the Consul of Argentina in Switzerland and Mr. de Hoop Cartier did, for about a week, to help get acclimated to life in a new country.  Seeing that Mr. de Hoop Cartier had only a few clothes with him, the Consul had his son him give a spare suit (which fit Mr. de Hoop Cartier poorly, at best), and he headed a few hours west by train to Leysin.

---

[1] In 1998-1999, after Mr. de Hoop Cartier had attended, the school entered into a partnership and later merged with Glion.  In 2004, the Leysin/HOSTA campus closed.

Mr. de Hoop Cartier knew quite quickly that he had made the right choice in coming to HOSTA. He was struck by the storybook beauty of the Swiss Alps and proximity to world-class skiing (another of Mr. de Hoop Cartier's lifelong hobbies), and loved how international his classmates were, as they came from all over the world. It was truly a chance for a new beginning.

Indeed, it was during this period of his life that Mr. de Hoop Cartier met the people who went on to become some of the most important and significant people to him, through the present day. The abundance of young people in the town made for a communal, convivial atmosphere, and Mr. de Hoop Cartier found it easy to make friends. Paula Roldos, a friend who studied at The American College of Switzerland in Leysin at the same time that Mr. de Hoop Cartier was at HOSTA, remembers him as "always polite and helpful [to] teachers and a wonderful friend offering an authentic friendship." (Exhibit A, Roldos letter.) She writes that "[p]eople in the village of Leysin recognize Max in the street after 30 years and invite him to their homes," and that Mr. de Hoop Cartier counts among his friends "simple Swiss farmers who live in the village and remember him for his genuine, authentic character" and the "old coffee shop owner, Mr. Gilbert." (*Id.*) His friends Andres Castello Solano and Greg Jones, both fellow HOSTA alums, fondly recall the years they spent in Leysin with Mr. de Hoop Cartier, and particularly time spent pursuing their common shared interests in skiing and fitness. (Exhibit A, Castello and Jones letters). Roberto Anderson, another HOSTA alum, recalls that Mr. de Hoop Cartier was "a very well known young man" in Leysin, who "everyone knew" because he interacted with other "expats, [] students, locals, and employees from different schools and Banks," in particular through sports such as "tennis, squash, [and] skiing." (*Id.*, Anderson letter.) Anderson further remembers Mr. de Hoop Cartier as a "very good neighbor." (*Id.*)

### C. Mr. de Hoop Cartier's Early Career Experiences

Mr. de Hoop Cartier's program at HOSTA consisted of two years of study and a six-month internship. In 1989, Mr. de Hoop Cartier graduated and, as his first significant romantic relationship came to an end, he decided to move to London for a year, where he connected with friends from Switzerland. He first worked as a waiter and bartender and later, as an assistant general manager at a small hotel. In this period during his free time, however, Mr. de Hoop Cartier was working on a business plan for an import/export business that would allow him to move back to Switzerland. After two years in London, he moved back to Switzerland in 1992, this time to Lausanne, to launch the company he named "Dolphin South Atlantic."

Dolphin South Atlantic was an import/export business for food products, and its most successful product quickly became shrimp that he imported from Patagonia, Argentina that Mr. de Hoop Cartier then sold to Coop and Migros, Switzerland's two largest supermarket chains. He sold his products under the brand name "Patagonia," the trademark of which he had registered internationally, except in South America, with the help of an IP attorney in Geneva. Mr. de Hoop Cartier initially encountered some difficulties in getting the trademark registered, as his application was initially rejected by the trademark office in Brussels on the grounds that he could not trademark a geographical region. Mr. de Hoop Cartier, however, not one to give up easily, quickly assembled a list of brands that were also place names, and resubmitted the application with this list attached. It was approved soon after. Mr. de Hoop Cartier also imported corn from Argentina that he supplied to a Kellogg's factory for breakfast cereal, and, thanks to a budding interest in oenology and viticulture, he also started importing wine, champagne, and cognac to local distributors, who would then sell the products to hotels, restaurants, and cafes. Mr. de Hoop Cartier's business took off quickly, and he initially found his endeavors quite rewarding.

7

During this time, Mr. de Hoop Cartier also obtained the European distribution rights to Quilmes, the famed Argentine beer with 80% market share in Argentina that, in the late 1990s, had no brand name recognition outside of Argentina.  In connection with this venture, he operated large warehouses in Holland and Pully, Switzerland, and employed over 150 hostesses to promote the beer around Europe.  The task was difficult, as most had never heard of Quilmes and had no interest in purchasing it for sale in their establishments, and Mr. de Hoop Cartier grew accustomed to a frosty reaction to his sales pitch.  Eventually, however, Mr. de Hoop Cartier obtained success, and was able to get Quilmes placed in Spain, the Netherlands, Germany, Switzerland, Italy, and the United Kingdom.  Over time, however, he came to feel that the company was taking advantage of him, because Mr. de Hoop Cartier needed to front many of the initial launching costs before he was ultimately reimbursed.  Although the brand wanted to retain Mr. de Hoop Cartier, he decided to part ways with Quilmes.

Mr. de Hoop Cartier worked tirelessly during this period and relied heavily on assistants he hired.  Severine Dimo, whom he hired to assist in the daily marketing tasks of his business, writes, "he struck me from our first interaction as someone respectful, generous, and profoundly kind." (Exhibit A, Dimo letter).  She writes that in his professional dealings, "he always distinguished himself by his kindness, his seriousness, and his consideration for others."  (*Id.*) What developed was a lasting friendship that continues to the present day.

### D.  Mr. de Hoop Cartier's Desire for Change and his Return to Argentina

When Mr. de Hoop Cartier lived in Leysin, he had the opportunity to connect and form friendships with a number of political refugees, including from Kosovo in particular, as the small Swiss village is known as a haven for displaced peoples.  At the end of the 1990s, Mr. de Hoop Cartier came to learn that a close friend of his had returned to Kosovo during the time of the war,

8

and this friend described to Mr. de Hoop Cartier the dire humanitarian situation in his country. Always someone inclined to help others in their time of need, Mr. de Hoop Cartier jumped into action, and over the course of seven months in 1998-1999, he relied on his professional expertise in the import and export of food products to set up a warehouse in Thesalokini, Greece, to which he imported food and that was then delivered into Kosovo by truck. His friend was grateful for his assistance, and after the war, he received official thanks from the newly formed government of Kosovo for his efforts.

When Mr. de Hoop Cartier re-devoted himself fully to his business ventures in Switzerland after the war had concluded, he found himself asking life's big questions and struggled to find meaning in his daily activities after witnessing the horrific situation in the war zone in Kosovo. On top of that, he had been working non-stop, weekends included, for many years without a break, and found himself increasingly tired and struggling to find meaning in his work. Mr. de Hoop Cartier made the decision to liquidate Dolphin South Atlantic and take a sabbatical year during which he travelled extensively, including spending a period of a few months in the Dominican Republic. As his year "off" was coming to a close, Mr. de Hoop Cartier's father fell ill with prostate cancer, which quickly metastized to other organs, and Mr. de Hoop Cartier wanted to be near him in the final months of his life. His father still resided in Buenos Aires, and Mr. de Hoop Cartier thus decided to return to Argentina.

Upon his return to his home country in 2001, Mr. de Hoop Cartier took some time to plot his next move. He settled upon the idea to purchase and modernize an old and once-great brewery, Cerveceria San Carlos, a 46,000 square meter plant with an installed production capacity of 50 million bottles per year, which had fallen into bankruptcy. Mr. de Hoop Cartier solicited money from investors and threw himself into the project. He chose to market the beer under the

9

brand name Patagonia but was quickly met with resistance from Quilmes (the same Quilmes he had worked for in Europe), with good reason – Quilmes owned the trademark for Patagonia in Argentina.  When Mr. de Hoop Cartier originally registered the Patagonia trademark some ten years prior, he did not register it in South America, as at the time, he had no intention of returning to Argentina.  This left an opening for another person or entity to register it there, and Quilmes – the same Quilmes whose beer Mr. de Hoop Cartier had once worked so hard to introduce in Europe – had done so.  As the original trademark registrant, Mr. de Hoop Cartier had the right of first refusal, but he chose not to contest Quilmes's application because he felt betrayed by the company for which he had worked.  Mr. de Hoop Cartier thus chose to walk away rather than fight, and Quilmes was granted the trademark in Argentina.  Looking back, this is one of Mr. de Hoop Cartier's greatest regrets.  Mr. de Hoop Cartier ultimately settled with Quilmes in Argentina and agreed to market the beer under the "Patagonia" brand for the export market to countries outside of South America (where he did still hold the trademark) and under the name "Primitiva" for the South American market.

Despite his tireless efforts and a promising start to the venture, Mr. de Hoop Cartier was unable to sustain his initial success, and he was ultimately forced to abandon the project.  As Mr. de Hoop Cartier recalls, this was due to shareholder money drying up as a result of the 2008-2009 financial crises and a series of other unfortunate events, such as the brewmaster adding too much yeast and ruining a critical production batch.  Enrique Schinelli Casares, a lawyer Mr. de Hoop Cartier hired as legal counsel on the venture and who worked with Mr. de Hoop Cartier on it for two years, recalls that "[t]his failure hit Max hard, as he had put all his efforts in the project." (Exhibit A, Schinelli letter.)  Schinelli blamed the company's failure on its "inability to compete with the major brands on a tight budget."  *Id*.  Nonetheless, Schinelli recalls that while some

10

marketing experts "focus[ed] on the commercial issues while looking at legal or compliance aspects with certain disregard, [t]his was not the case for Max." (*Id.*)  Mr. de Hoop Cartier's "project was very personal for him," Schinelli writes, and "he dedicated his heart and soul to it." Due to the various difficulties he faced, Mr. de Hoop Cartier sold the brewery in 2010 and later, sold the Patagonia trademark that he still owned internationally (except in South America) to the California-based outdoor apparel company Patagonia.

### E.  Mr. de Hoop Cartier's Next Steps, Return to Europe, and Plans for the Future

After Mr. de Hoop Cartier's involvement in the beer market ended, he sought opportunities in the water market – specifically, to bottle water from the Patagonia region, which is known for its crystal clear water and springs.  He was granted a concession from the government to take over bottling at Santo Tomas, Neuquen, in Patagonia.  Mr. de Hoop Cartier travelled to Monaco in 2013, when his water business was nascent, and he had the opportunity to present a business plan to Prince Albert of Monaco, who then sponsored a booth for Mr. de Hoop Cartier at SIAL food exposition in Dubai to represent Monaco.   Yet despite interest and enthusiasm in the project from many influential friends and acquaintances, Mr. de Hoop Cartier struggled to raise the necessary capital to get the project off the ground.  He ended up doing only one production of Agua Patagonia, for a client he had met in Dubai, and then folded the company he had set up for that purpose.

Mr. de Hoop Cartier returned permanently to live in Europe in 2015, when he first moved to Monaco, where he had several close friends, and later Paris, where he was residing up until the time of his arrest.  Mr. de Hoop Cartier fell into his next career almost by accident – stuck inside and alone, having newly arrived in Paris just prior to the start of the Covid-19 pandemic, Mr. de Hoop Cartier found himself singing for enjoyment and recalled that an ex-girlfriend from Brazil

11

had been particularly enamored with his voice and had encouraged him to pursue singing publicly.  Finding himself at home, alone, Mr. de Hoop Cartier googled private singing lessons, and found a tenor who sings opera at Palais Garnier.  Mr. de Hoop Cartier went for lessons as soon as the lockdown restrictions lifted, and he recalls the teacher being amazed by his talent.  Mr. de Hoop Cartier couldn't believe that an esteemed singer of the tenor's caliber would have such a high opinion of his musical talent, so he sought the opinion of two others who, to Mr. de Hoop Cartier's delight, agreed with the tenor's assessment.  Multiple professionals even told him, "Max, you were born to sing!"  This was all the encouragement Max needed, and eventually, Mr. de Hoop Cartier started working regularly with a vocal coach named Sarah Sanders, an 84-year-old French opera singer with 30 years of experience in Broadway productions.  They developed a warm relationship.  An Argentine friend with whom Mr. de Hoop Cartier shared some of his songs put him in touch with Los Angeles-based music producer Chris Walden, and this led to a collaboration that culminated in the recording of Mr. de Hoop Cartier's first album, Words of Love, in 2023.  It was recorded at the iconic Capitol Studios in Los Angeles, shortly before the studio was closed indefinitely for renovations, and Mr. de Hoop Cartier even sang on the preferred microphone that had been owned by one of his favorite singers, Frank Sinatra.  He truly felt as though he were living a dream, as even the famous music producer David Foster invited him to his house in Palm Springs to sing and invited him back to the States to start recording.

It was in June of that year (2023), only a few months after his album release, that Mr. de Hoop Cartier put on a solo concert at the Teatro Colisseo in Buenos Aires.  Along with two of his back-up singers, he flew from Paris and put on a full show of classic hits and original music with the symphony orchestra from the famous opera house Teatro Colon.   Just as Mr. de Hoop Cartier has impressed great vocal talents with his singing, he also impressed his friends.  Paula Roldos

writes, "Max has talent in singing.  He is capable of truly touching people's hearts with his songs that make others happy.  He has been brave to embrace singing late in his life and organizing concerts to finally fulfill a lifelong dream and give his talent generously to the world." (Exhibit A, Roldos letter.)  Enrique Schinelli Cacares, who was able to attend Mr. de Hoop Cartier's Buenos Aires show with his wife, recalls that while he was expecting to find Mr. de Hoop Cartier's singing to be merely a "simple pastime," he was instead pleasantly surprised by the professional nature of the show and Max's "real talent." (*Id.*, Schinelli letter.)   Andres Castello Solano wrote, "In 2023-2024 he started a new life as a Frank Sinatra-type singer, and we were completely in shock the first time we heard him because we never knew he could sing and he does it really well."  (*Id.*, Castello letter.)  Several other friends expressed similar sentiments.

Mr. de Hoop Cartier was recording music up until his arrest, and views his singing career as only just having started.[2]  In early 2024, he had been preparing to launch a new album, and had plans to spend a few months in Los Angeles starting in March 2024 for that purpose.  Of course, those plans were never realized as Mr. de Hoop Cartier was picked up by federal law enforcement agents in Miami in late February 2024, as he was on his way to Costa Rica to meet a friend for a short vacation before going to Los Angeles.  Instead of recording music in Los Angeles, he found himself being transported by buses and planes and cycling through six different jails before finally landing at the MDC four months later.  When Mr. de Hoop Cartier is able to resume his life once released from prison, he plans to resume his singing career.  He intends to put out a new album, release the 50 additional songs he has already recorded, give additional live concerts in

---

[2] *See* "Unforgettable" available on YouTube, "How Do You Keep the Music Playing?" available on YouTube; "Mi Buenos Aires Mon Amour" available on YouTube; "It's Impossible," available on Spotify.

13

Argentina and elsewhere, and continue to build his online presence for his music on Spotify, Instagram, YouTube, and TikTok, where he has already started to gain a following.

### F. The Offense Conduct

When Mr. de Hoop Cartier was living in Monaco in 2017, a friend introduced him to cryptocurrency, and despite being previously unfamiliar with cryptocurrency, Mr. de Hoop Cartier quickly developed real interest in what he saw as an exciting new space. He started trading on various recognized exchanges, such as Blockfils and OSL, and soon realized that he could make enough money to support his daily living expenses and what would soon become his burgeoning singing career.

Over time, Mr. de Hoop Cartier developed a small customer base through word of mouth, and began doing some trading on behalf of his clients.[3] Mr. de Hoop Cartier quickly realized that he needed a way to verify the identity and legitimacy of his customers. Therefore in October 2018, Mr. de Hoop Cartier engaged Kroll to develop an anti-money laundering policy and KYC process for his business. He did KYC checks on a number of his clients, including several from Colombia, and they all passed muster.[4] When Mr. de Hoop Cartier's relationship with Kroll ended due to its expense, he hired K2 for the same work. And when K2 reported that some of his

---

[3] In 2019, the purchase and exchange of 1200 Bitcoin using one of Mr. Cartier's companies, Vintech Capital LLC, which amounted to a contract of approximately 22 million USD broken out in 500,000 USD increments, was disclosed in a Sale and Purchase Agreement filed with the Securities and Exchange Commission. Sale and Purchase Agreement (May 15, 2019), https://www.sec.gov/Archives/ edgar/data/1378125/000164033419001347/togld_ex107.htm.

[4] *See, e.g.*, USAO_REL_0000371272 (October 14, 2019 email from James Brennan (at Kroll) to David D'Amico (at Signature Bank) in which he sent diligence checks performed on an array of clients) (Exhibit B).

14

potential clients appeared suspicious, Mr. de Hoop Cartier declined to do any business with those entities and individuals.[5]

Mr. de Hoop Cartier accepted fiat[6] currency from his clients, but this soon led to problems. Specifically, in late 2020, a Colombian national, Felipe Vallejos, connected Max to a new U.S. client, Sarkedrom Management LLC, that was interested in purchasing $200,000 in cryptocurrency. Because Mr. de Hoop Cartier had worked with Mr. Vallejos in the past without issue, he did not think it was necessary to go through the KYC process and agreed to enter a business relationship with Sarkedrom. Over the next two months, Sarkedrom wired a total of $937,648.98 to certain of Mr. de Hoop Cartier's companies through over a dozen wires. Unbeknownst to Mr. de Hoop Cartier, Mr. Vallejos had connections to the Colombian drug trade and Sarkedrom was an undercover FBI account.

In or around March 2021, the Drug Enforcement Agency (DEA) froze accounts at Citizens Bank belonging to three of Mr. de Hoop Cartier's companies: VC Innovated, AZ Technologies, and Softmill. At the time, Mr. de Hoop Cartier had no idea why the funds, totaling $1,168,716, were seized. Mr. de Hoop Cartier had grown comfortable, and perhaps complacent, following months of work from Kroll and K2, but the seizure awakened Mr. de Hoop Cartier and he quickly hired Trulioo to resume customer verification work. After receiving the notices of seizure and retaining as counsel a former federal prosecutor in the Southern District of New York,

---

[5] *See, e.g.* USAO_REL_0000245474, (March 11, 2020 email from K2 advising Mr. de Hoop Cartier not to onboard a client) (Exhibit C); USAO_0000036637 (June 11, 2020 email from K2 advising Mr. de Hoop Cartier to not onboard two clients) (Exhibit D).

[6] Fiat currency is money not backed by a physical commodity like gold or silver, but rather is issued and regulated by a government. Examples include the U.S. dollar, Euro, Swiss franc, and Yen.

Mr. de Hoop Cartier was surprised to learn that, according to the DEA, his accounts contained approximately $880,649 in suspected drug proceeds.

Mr. de Hoop Cartier then voluntarily travelled twice from Europe to Philadelphia, at his own expense, to meet with federal agents and the civil division of the U.S. Attorney's Office in the Eastern District of Pennsylvania. He provided the government with documentation showing the nature of his business, including contracts and other documents[7] naming CS-1 and Felipe Estrada[8] and their companies – something he never would have done had he suspected that CS-1 and Mr. Estrada were also transacting in drug proceeds. The government (neither the DEA or the civil AUSAs) apparently never probed Mr. de Hoop Cartier's connection to either person, and Mr. de Hoop Cartier left with the understanding that he could continue to do business with them.

The DEA ultimately returned approximately $768,716 of the seized funds to Mr. de Hoop Cartier and kept only $400,000 pursuant to a settlement agreement.[9] Mr. de Hoop Cartier faced no other legal consequences, which he took, wrongly, as confirmation that the illicit funds were anomalous and the rest of his business was fine. Because Mr. de Hoop Cartier suspected that Mr.

---

[7] The government has asserted that these documents were backdated. Though these contracts were indeed back-dated, the contracts were not themselves fraudulent – Mr. de Hoop Cartier created them to accurately reflect the date on which the relationships started with his customers.

[8] Though initially charged with Conspiracy to Commit Money Laundering, this charge was later dropped when Mr. Estrada pleaded guilty pursuant to a plea agreement to a one-count superseding information. The Information charged him with operating of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(b)(1)(C) with a maximum penalty of 5 years imprisonment. (*See* 24-cr-133 Dkt. 189). On April 8, 2026, the Court sentenced Mr. Estrada to a custodial sentence of 48 months' imprisonment. CS-1 is identified in the complaint as a confidential source who was "charged by federal complaint with conspiracy to commit money laundering and operation of an unlicensed money transmission business" and is now "cooperating with law enforcement…in the hopes of obtaining leniency at sentencing." (*See* 24-cr-133 Dkt. 1 ¶ 13.)

[9] *See* Settlement Agreement dated April 22, 2022 (Exhibit E).

Vallejos was the source of the illicit funds that caused his accounts to be seized, he pursued legal action against Mr. Vallejos in Colombia accusing Mr. Vallejos of sending tainted funds to his business, which, to his knowledge remains ongoing.[10]  After filing suit against Mr. Vallejos, Mr. de Hoop Cartier also reported what he perceived as retaliatory death threats originating from Mr. Vallejos to the FBI.

As a result of these negative experiences and impact to his business, Mr. de Hoop Cartier changed his business model in two important ways.  First, he made the decision to no longer accept fiat currency, and secondly, he gave up doing all business with clients in Colombia except those transactions that were facilitated by CS-1, whom he been introduced to via a trusted contact at a reputable cryptocurrency exchange.  Mr. de Hoop Cartier and CS-1 had developed rapport over the years and had met multiple times in person.  CS-1 had even brought his mother, or in retrospect, perhaps a person pretending to be his mother, to some of those meetings, which achieved the intended effect – making Mr. de Hoop Cartier feel as though he knew and could trust CS-1.  In all of their communications, CS-1 presented himself as a legitimate businessperson and never made any reference whatsoever to narcotics proceeds.  Mr. de Hoop Cartier believed him.

Eventually, however, Mr. de Hoop Cartier settled on a process whereby his customers would send him tether (USDT), a stablecoin, to a wallet he controlled at a cryptocurrency exchange, and then he would convert the USDT to U.S. dollars, which he would then deposit into a bank account in the United States.  Then, he would keep a small percentage for himself (usually in the range of 0.5% of the total transaction size), and send the remainder to his client at a bank overseas that the client would indicate.  This meant that Mr. de Hoop Cartier was essentially

---

[10] *See* USAO_0000103115 ("Denuncia" dated September 12, 2023). (Exhibit F1);
USAO_0000103109 (English translation) (Exhibit F2).

operating a money transmitting business, and while he registered two of his companies, VC Innovated LLC and Vintech Capital LLC, with FinCEN as money services businesses, he did not obtain the requisite licenses with state regulators, and he ultimately allowed his FinCEN registrations to lapse, in violation of 18 U.S.C. §§ 1960(b)(1)(A) and (b)(1)(B).

Mr. de Hoop Cartier's business, as explained above, required Mr. de Hoop Cartier to have companies and associated bank accounts in the U.S., and soon after he became involved with cryptocurrency, Mr. de Hoop Cartier learned that many banks were averse to handling crypto proceeds or to any overt references to crypto trading being the source of a client's business.[11] Thus, between 2018 and February 2024 (the period in which Mr. de Hoop Cartier operated), Mr. de Hoop Cartier provided certain banks with false information about the nature of his business. For example, in November 2021, Mr. de Hoop Cartier signed a banking application at Wells Fargo for his company Bullpix Solutions which stated that his company was in the software development business. This was not true, but Mr. de Hoop Cartier viewed it as necessary to allow him to conduct his business. While he knew it was wrong to provide false information, he did not appreciate the seriousness of providing false information to banks and, as someone who never spent significant time in the U.S., could not have imagined how severe the consequences might be. Further, Mr. de Hoop Cartier justified his conduct at the time because he believed that on some level, the banks knew he was doing crypto because the incoming wires were from well-known cryptocurrency exchanges. He now realizes the gravity of his conduct and made the decision to plead guilty.

---

[11] When Mr. de Hoop Cartier was interviewed by the DEA in 2021, he told the agents that he did not conceal his crypto business from some banks, such as Citizens Bank, which he understood to be "crypto friendly."

Mr. de Hoop Cartier's decision to do business with CS-1 turned out to be a grave mistake, as unbeknownst to Mr. de Hoop Cartier, CS-1 was an illegitimate actor deeply involved in criminal activity who actively *hid* from Mr. de Hoop Cartier his criminal connections.  Mr. de Hoop Cartier is far from the leader of the criminal scheme that is being prosecuted in this case, as the Court has suggested.[12]  Mr. de Hoop Cartier was simply one link in the chain assembled by CS-1.  It was CS-1, the "Facilitator," not Mr. de Hoop Cartier, who concocted the scheme and assembled the players.  (Complaint at ¶19(e)).  As further described below, when Mr. de Hoop Cartier conducted business with CS-1, he had no idea of the role he was playing within a broader scheme – he viewed CS-1 as an independent actor.  This was by design – as the Government itself acknowledges, communication between members of the criminal network went through CS-1, such that Mr. de Hoop Cartier was not even aware that such communications were occurring. (*Id.*)

## II.    SENTENCING DISCUSSION

We respectfully submit that the Section 3553(a) factors counsel leniency in this case and that a significant downward variance is warranted, in recognition of the more than two years already served in harsh conditions, the mitigating facts, and the outsize impact of the monetary amount on the Sentencing Guidelines recommendation.

### A.  Applicable Legal Standard

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 245 (2005), the Sentencing Guidelines are genuinely "guidelines—that is, they are truly advisory." *United States v. Maxwell*, 118 F.4th 256, 270 (2d Cir. 2024). Therefore, although "a district court

---

[12] Estrada Sentencing Tr. 14 ("Mr. de Hoop Cartier…who I understand to be the sort of leader of this whole network").

should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," the Court must "consider all of the § 3553(a) factors" and "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (internal citations and quotations omitted); *see also United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (reasonableness of a sentence is driven by "the district court's individualized application of the statutory sentencing factors," not "the amount by which a sentence deviates from the applicable Guidelines range").

These delineated purposes include: the nature and circumstances of the offense and the history and characteristics of the defendant; the seriousness of the offense; the need to promote respect for the law and provide just punishment; considerations of general deterrence; protection of the public from further crimes of the defendant; the provision of educational or vocational training, medical care, or other correctional treatment; the types of sentences available; and the avoidance of unwarranted disparities. 18 U.S.C. § 3553(a). The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. *Id*. Although mercy is "seldom included on the list of 'traditional' rationales for sentencing," it is embodied in this provision, which requires "that the lowest possible penalty consistent with the goals of sentencing be imposed." *United States v. Blarek*, 7 F. Supp. 2d 192, 210 (E.D.N.Y. 1998).

### B.  The Advisory Guidelines Calculation

Mr. de Hoop Cartier pleaded guilty, pursuant to a Plea Agreement with the government signed on October 20, 2025, to two offenses: (1) operating an unlicensed money transmitting

business without an appropriate license, in violation of 18 U.S.C. § 1960(b)(1)(A)[13], and (2) conspiracy to commit bank fraud in violation of 18 U.S.C. § 371.

The plea agreement contains a stipulated Guidelines range of 108 to 120 months' imprisonment. Though Mr. de Hoop Cartier's applicable Guidelines range is 108 to 135 months, pursuant to U.S.S.G. § 5G1.2, because the statutory authorized maximum sentence of ten years' (or 120 months') imprisonment is less than the high-end of the applicable Guidelines range, the stipulated Guidelines range is capped at the statutory maximum of 120 months.

The Guidelines calculation is driven to that high number by the *total* amount of money transmitted through Mr. de Hoop Cartier's unlicensed money transmittal businesses over the period of their existence, even though the amount traceable to illicit funds is only a small fraction of that amount. The bank fraud count does not affect the Guidelines calculation – the bank fraud calculation is based on a zero dollar loss amount, as no loss resulted from Mr. de Hoop Cartier's conduct with respect to the banks.

### C. Application of the § 3553(a) Factors Supports a Sentence Reflecting a Significant Downward Variance

1. Mr. de Hoop Cartier's Role in the Offense and the Nature of the Conduct Warrants a Sentence Reflecting a Significant Downward Variance

Mr. de Hoop Cartier accepts full responsibility for his criminal conduct. This conduct, however, merits a sentence far below the applicable Guidelines range and well below the eight years recommended by the Probation office. He pleaded guilty to operating a money transmitting business without a license and conspiring to commit bank fraud. As the government acknowledged at the plea hearing, there were no victims of these offenses who incurred any

---

[13] Operating a money transmittal business without the appropriate license is a violation "whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable." 18 U.S.C. § 1960(b)(1)(A).

financial loss.  And although that conduct is serious, several mitigating factors warrant a significant downward variance.

*First*, there is no evidence to suggest that Mr. de Hoop Cartier had any actual or constructive knowledge that any of the funds he transacted were connected to the drug trade. Though he was told that the reason why three of his bank accounts were seized in 2021 was because of suspected drug transactions, the DEA *returned* about two-thirds of the money it seized from Mr. de Hoop Cartier pursuant to a settlement agreement in 2022, something the DEA never would have done if it believed that Mr. de Hoop Cartier was knowingly participating in a conspiracy to launder the proceeds of narcotics trafficking.  In all of the terabytes of discovery that the government produced, there is no communication in which any co-conspirator, cooperator, or witness ever told Mr. de Hoop Cartier of the existence of drug proceeds.[14]  Nor is there any indication that Mr. de Hoop Cartier knew or should have known that CS-1 or Mr. Estrada had any connection whatsoever to the secretive underworld of Colombian drug trafficking, a world with which Mr. de Hoop Cartier is wholly unfamiliar.  Mr. de Hoop Cartier provided records to the DEA and the U.S. Attorneys' Office for the Eastern District of Pennsylvania identifying Felipe Estrada Echeverry and his company Big Data, as well as CS-1, as his counterparties.  It is inexplicable that he would have done so had he known they were involved in laundering drug proceeds.

---

[14] In contrast, CS-1 told CC-2, for example, "you know the money we handle comes from drug trafficking, right?" to which CC-2 replied, "money comes from there but cryptocurrency is being sold." (Dkt. 1 at ¶ 26(b)). CC-2 is Erica Milena Lopez Ortiz, who was charged with conspiracy to commit money laundering and conspiracy to import cocaine.  Charges against her remain pending. The government has never cited any such evidence against Mr. de Hoop Cartier, notwithstanding that several different government agents or sources interacted with him.

There also is no evidence, as explained above, suggesting that Mr. de Hoop Cartier knew or should have known that he was operating within a much more extensive scheme. In fact, Mr. de Hoop Cartier did not know of the existence of, and was not in communication with, any of his co-conspirators who have been accused of having direct connections to narcotics. The only co-defendant he had ever been in touch with was Mr. Estrada, whom he met through CS-1 and was presented to him as another legitimate businessman. Prior to the government filing its indictment, Mr. de Hoop Cartier had never even heard of Leonardo De Jesus Zuluaga Duque, Erica Milena Lopez Ortiz, Alexander Egidio Areiza Ceballos, or Adrian Fernando Areiza Ceballos. And as for Mr. Estrada, Mr. de Hoop Cartier never knew that he had nefarious connections to any criminal activity as the KYC on his company came back clean, and Mr. de Hoop Cartier ceased doing business with him following the seizure of his accounts by the DEA. As even the government acknowledges, Mr. de Hoop Cartier was several layers removed from the criminal source of the funds. Estrada Sent. Mem. Dkt. 217 at 2-3. At worst, he turned a blind eye to the possibility that the cryptocurrency he transacted in was tied to some illegal activity, but there is no indication that he knew or believed it to be the proceeds of narcotics activity.

*Second*, the government has conceded that there are no identifiable victims of Mr. de Hoop Cartier's conduct and the loss amount is zero.[15] No bank lost any money as a result of Mr. de Hoop Cartier's dishonest statements about the nature of his business. Mr. de Hoop Cartier never took out a loan or line of credit using any of the accounts that he opened or withdrew nor did he transfer any funds that were not rightfully in his possession. Nor did Mr. de Hoop Cartier steal from his customers, who were all willing counterparties who agreed to pay him a commission for his service of changing crypto back to fiat currency as a crypto trader.

---

[15] *See* Oct. 23, 2025 Tr. at 18.

*Third*, and relatedly, although very significant volumes of money flowed through the bank accounts that Mr. de Hoop Cartier opened for his companies, those transactions spanned over five years and Mr. de Hoop Cartier himself earned relatively little remuneration.  Mr. de Hoop Cartier typically kept in the range of 0.5 percent of each transaction, which aligns with standard fees in the crypto market for *lawful* transactions.  Of the money that he did keep, all of it was either seized and forfeited by the government (either in connection with Mr. de Hoop Cartier's prior encounters with the DEA, or as a result of his 2024 arrest) or was invested in his budding music career.  None of it remains.

*Fourth*, and perhaps most significantly, the evidence produced by the government in the course of its prosecution showed that Mr. de Hoop Cartier *did* undertake efforts to comply with the law.  For instance, in 2019 Mr. de Hoop Cartier obtained FinCEN registrations for two of his businesses, VC Innovated and Vintech Capital.  At least $150 million, and possibly more, flowed through his *registered* businesses.  After those registrations expired, Mr. de Hoop Cartier looked into renewing his federal licenses and obtaining state licenses but did not follow through.  He also took meaningful steps to conduct KYC in order to avoid taking on any customers with connections to illicit activity.  He engaged Kroll (also known as Duff & Phelps), K2, and Trulioo to perform customer due diligence and went out of his way to confirm with Kroll that it was safe to onboard clients in Colombia.  In addition, he also chose principally to work with exchanges that conducted chain analysis of the wallets from which Mr. de Hoop Cartier received USDT so that he could have an additional outside check and clearance on the source of the crypto he received.  Mr. de Hoop Cartier's efforts were imperfect and do not excuse his wrongdoing, but they deserve consideration in assessing his culpability.

24

Moreover, Mr. de Hoop Cartier admitted in his plea allocution that he declined to disclose the true nature of his businesses to certain banks, but the government's evidence also showed that Mr. de Hoop Cartier was upfront with other banks about his involvement in the cryptocurrency industry.  Mr. de Hoop Cartier's dishonesty stemmed from his belief that banks that were not crypto-friendly would not allow him to open an account if they knew that the purpose of the account was to accept wires from cryptocurrency exchanges, not because he sought to conceal a connection (albeit one unbeknownst to Mr. de Hoop Cartier) to the drug trade.[16]

2.   <u>A Sentence Without Significant Future Prison Time Avoids Unwarranted Sentence Disparities</u>

Given the circumstances of Mr. de Hoop Cartier's case, the marked change in the government's approach to cryptocurrency prosecutions,[17] and how defendants guilty of far more culpable conduct have recently been sentenced, sentencing Mr. de Hoop Cartier to anywhere near what Probation recommends (96 months), much less what the Guidelines contemplate (108-120 months), would be far too punitive.  Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  As Mr. de Hoop Cartier has already endured nearly two

---

[16] The government has argued that the contracts that Mr. de Hoop Cartier signed at the request of CS-1 indicate that he knew the funds he was transacting with were proceeds of narcotics trafficking.  This is false.  Mr. de Hoop Cartier understood that banks in South America typically required services contracts to approve large transactions.  Nor does the two-point enhancement provided for in the plea agreement for "kn[owing] or believ[ing] that the funds were proceeds of unlawful activity" establish that Mr. de Hoop Cartier knew the funds derived from the drug trade rather than from some other illicit activity common in the region, like tax evasion.

[17] *See* April 7, 2025 Executive Order 14178, "Ending Regulation By Prosecution," *available at* https://www.justice.gov/dag/media/1395781/dl?inline.  The House of Representatives also passed the Digital Asset Market Clarity Act of 2025, which aims to bring more clarity to cryptocurrency regulation and is under debate in the Senate, *available at* https://www.congress.gov/bill/119th-congress/house-bill/3633/text.

extremely difficult years at the MDC, the only sentence that would avoid creating unwarranted sentence disparities would be one that takes into consideration the sentences of others who have been found to have allowed their crypto businesses to be used for illicit funds, and at worst, imposes minimal additional prison time.

Courts have frequently imposed time served sentences in similar circumstances in recent cryptocurrency-related cases. In *United States v. Legkodymov*, a prosecution against the founder of now-defunct cryptocurrency exchange Bitzlato, Legkodymov was sentenced to time served after spending 18 months at the MDC. Legkodymov "profited from catering to criminals" and "was repeatedly advised that cryptocurrency routed through Bitzlato represented the proceeds of crime and/or was intended for use in illicit transactions." *Founder and Majority Owner of Cryptocurrency Exchange Pleads Guilty to Unlicensed Money Transmitting*, U.S. Dep't of Justice (Dec. 6, 2023), https://www.justice.gov/archives/opa/pr/founder-and-majority-owner-cryptocurrency-exchange-pleads-guilty-unlicensed-money. And, lax KYC procedures, such as allowing users to openly provide information belonging to "straw man" registrants, allowed customers of the dark web market HydraMarket to exchange more than $700 million in cryptocurrency with Bitzlatzo. Legkodymov's prolonged difficult stay at the MDC factored into the court's decision to sentence him to time-served. "It's a terrible place, and the court does consider that," Judge Vitaliano said. *See* July 18, 2024 Tr. at 54, 23-CR-496 (E.D.N.Y.). Mr. de Hoop Cartier has been at the MDC for significantly longer, and his conduct is less egregious.

In *United States v. Andriunin*, the defendant pled guilty to conspiracy to commit market manipulation and wire fraud in connection with providing fraudulent "volume creation" services to customers of his market maker cryptocurrency company. His plea agreement contained a sentencing guidelines range of 12 to 18 months, and the judge sentenced him to time served (after

Andriunin had spent eight months incarcerated), below the government's request for a guidelines sentence of 15 months.  Judgment, No. 24-cr-10190 (D. Mass. June 18, 2025).  And in *United States v. Hayes et al.*, the three executives and one employee of Bitmex (a cryptocurrency derivatives exchange) were all sentenced to probation, despite pleading guilty to violating the Bank Secrecy Act for failing to implement money laundering controls on their crypto platform, leading to $200 million in illicit transactions.  Judgment, No. 20-cr-500 (S.D.N.Y. Nov. 18, 2022).  All three executives have since been pardoned.

In recent cryptocurrency cases where courts have imposed the maximum or close to the maximum sentence of five years for operating an unlicensed money transmitting business, the defendants' conduct in those cases was far worse than Mr. de Hoop Cartier's conduct here.  For example, in the Samourai Wallet case, the defendants Keonne Rodriguez (CEO of Samourai) and William Lonergan Hill (CTO of Samourai), pled guilty to operating a money transmitting business (after the government previously dropped the conspiracy to commit money laundering charge it initially filed) and were sentenced to five and four years, respectively.  *See Founders Of Samourai Wallet Cryptocurrency Mixing Service Sentenced To Five And Four Years In Prison*, U.S. Dep't. of Justice (Nov. 19, 2025), https://www.justice.gov/usao-sdny/pr/founders-samourai-wallet-cryptocurrency-mixing-service-sentenced-five-and-four-years.  In stark contrast to Mr. de Hoop Cartier, the defendants actively promoted the usefulness of their mobile application for concealing criminal proceeds – Rodriguez described the crypto-mixing services the application offered as "money laundering for bitcoin" and Hill stated that their service allowed users to "clean dirty BTC." *Id*.  Thus, the defendants knew that their crypto-mixing service enabled criminals to wash millions in dirty money – proceeds from cryptocurrency thefts, drug trafficking operations, and fraud schemes – and promoted it for this purpose in their own marketing materials. *See*

27

*Founders Of Samourai Wallet Cryptocurrency Mixing Service Plead Guilty*, U.S. Dep't. of Justice (Aug. 6, 2025), https://www.justice.gov/usao-sdny/pr/founders-samourai-wallet-cryptocurrency-mixing-service-plead-guilty.  Further, the design of the mobile application the Samourai Wallet defendants created had the specific goal of obfuscating where the more than $200 million in illegal transactions had come from and where they were going, complicating the job of law enforcement in going after bad actors.  *Id.*[18]  This is in sharp contrast to Mr. de Hoop Cartier, who made efforts to conduct KYC including for CS-1 and Mr. Estrada and their KYC came out clean, and to avoid dealing with bad actors, and whose transactions are easily traceable.

Aside from the Samourai Wallet and Tornado Cash cases, the prosecution of the founders of KuCoin is a recent illustrative example of how the government's prosecution of Mr. de Hoop does not align with its treatment of far more culpable individuals.  *See Kucoin Pleads Guilty To Unlicensed Money Transmission Charge And Agrees To Pay Penalties Totaling Nearly $300 Million*, U.S. Dep't. of Justice (Jan. 27, 2025), https://www.justice.gov/usao-sdny/pr/kucoin-pleads-guilty-unlicensed-money-transmission-charge-and-agrees-pay-penalties.  While the government went after the KuCoin crypto exchange, securing a guilty plea for one count of operating an unlicensed money transmitting business and a hefty fine ($297 million USD), the founders, Chun Gan and Ke Tang, entered into two-year deferred prosecution agreements and

---

[18] In Tornado Cash, another recent crypto mixing case, the company facilitated more than $1 billion in illegal transactions, and Roman Storm, the CEO, and his co-founders made over $12 million in profits from this illegal activity.  *See Founder Of Tornado Cash Crypto Mixing Service Convicted Of Knowingly Transmitting Criminal Proceeds*, U.S. Dep't. of Justice (Aug. 6, 2025), https://www.justice.gov/usao-sdny/pr/founder-tornado-cash-crypto-mixing-service-convicted-knowingly-transmitting-criminal.  After a four-week trial before before Judge Failla, the jury deadlocked on the money laundering conspiracy charge against Storm, and convicted him of conspiring to operate a money transmitting business that "moved more than $1 billion in dirty money."  The parties are currently engaged in post-trial motion practice, and Storm has yet to be sentenced.

28

agreed to no longer have any role in KuCoin's management or operations.  In fact, KuCoin had over 30 million customers and billions of dollars' worth of daily trading volume in crypto and earned approximately $184.5 million in fees.  *See id*.  KuCoin failed to comply with basic AML and KYC laws – it did not even require customers to provide any identifying information, and KuCoin employees repeatedly told U.S. customers that KYC was not mandatory.   By contrast, from the outset, Mr. de Hoop Cartier hired reputable outside firms to do KYC, including Kroll (Duff & Phelps), and then Trulioo – precisely so that he could have an extra layer of certainty that the funds he was handling were legitimate.

Similarly to KuCoin, the government also did not charge any individual executives in the OKX cryptocurrency case.  Customers used OKX to facilitate more than $5 billion in suspicious transactions and illicit proceeds due to AML/KYC failures.  *See OKX Pleads Guilty To Violating U.S. Anti-Money Laundering Laws And Agrees To Pay Penalties Totaling More Than $500 Million*, U.S. Dep't. of Justice (Feb. 24, 2025), https://www.justice.gov/usao-sdny/pr/okx-pleads-guilty-violating-us-anti-money-laundering-laws-and-agrees-pay-penalties.  Yet, the government only went after the company.  OKX pled guilty to operating an unlicensed money transmitting business and agreed to pay penalties totaling more than $504 million.  Mr. de Hoop Cartier, by contrast, was a far less sophisticated actor operating in this space, and should not suffer a worse fate because he does not have funds to pay a significant fine.[19]

Finally, recent pardons of additional high-profile figures in the cryptocurrency world who were convicted of very serious offenses at a scale much larger than Mr. de Hoop Cartier only highlights that a prison sentence exceeding time served would be disproportionate in this case.  On October 23, 2025, President Trump pardoned Changpeng Zhao, founder and owner of

---

[19] He did, however, agree to forfeit $2,362,160.62 in seized funds as part of his plea agreement.

Binance, the world's largest cryptocurrency exchange in the world, who had been convicted of knowingly failing to implement KYC and AML programs in violation of the Bank Secrecy Act. *See Binance and CEO Plead Guilty to Federal Charges in $4B Resolution*, U.S. Dep't. of Justice (Nov. 21, 2023), https://www.justice.gov/archives/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.  Zhao was sentenced to only four months' imprisonment although prosecutors had sought 36 months.  According to the prosecution, "Zhao violated U.S. law on an unprecedented scale."  Gov. Sent'g Mem. at 4, *United States v. Changpeng Zhao* ("CZ"), No. 2:23-cr-00179 (RAJ) (W.D.W.A. Apr. 23, 2024).

In sum, sentencing Mr. de Hoop Cartier to a maximum sentence of five years for each count at issue, as the Guidelines recommends, or 48 months for each count consecutively, as Probation recommends, would produce an especially unwarranted and distinctly unfair disparity given the fate of recent cryptocurrency defendants.  Sentencing Mr. de Hoop Cartier – who was ensnared in a government sting operation and unlike more culpable defendants did not actively solicit customers who sought to clean dirty crypto – to a sentence no greater than Mr. Estrada's would be a sentence sufficient but not greater than necessary, and would be a just outcome that avoids creating unwarranted disparities with other sentences recently imposed in the crypto space.

3. The Sentencing Guidelines Range Does Not Properly Reflect Mr. de Hoop Cartier's Culpability When Considering the 18 U.S.C. § 3553(a) Factors

The advisory guideline sentence range of 108 to 120 months, based on the statutorily authorized maximum sentences, is too high in Mr. de Hoop Cartier's case by a significant margin in light of the 18 U.S.C. § 3553(a) factors.  The guideline applicable here, U.S.S.G § 2S1.3, is largely driven by the corresponding "value of the funds involved in the offense," which has been calculated as "approximately $472,000,000 in transactions."  (PSR at ¶ 75.)  But the calculation of

the funds involved in the underlying offense for Count 1 (operation of an unlicensed money transmitting business violation of 18 U.S.C. § 1960) and Count 2 (conspiracy to commit bank fraud in violation of 18 U.S.C. 371) and the resulting sentencing range do not comply with the purposes set forth in § 3553(a), including reflecting the seriousness of the offenses and providing just punishment for the offenses.  It also significantly overstates his relative culpability as compared to other defendants in the case.  Therefore, a significantly lower sentence is called for under § 3553(a).

Importantly, relying on the §2B1.1 loss table corresponding to the value of the funds involved in the offense in this case intuitively strikes the wrong chord.  The table is designed to apply in fraud cases where a defendant caused real or intended loss to victims by defrauding them of their money.  From that perspective, the loss table serves a useful function in recognizing that a greater loss causes greater harm, meriting a concomitantly greater guidelines sentence.  In this case, however, as stated above, the government has conceded that no victims incurred any loss as a result of Mr. de Hoop Cartier's conduct.  No bank lost any money as a result of his dishonesty, and he did not steal any money from his customers.  Therefore, the purported loss amount does not reflect any loss of money by Mr. de Hoop Cartier's customers, banking partners, or anyone else.  As such, the guidelines in this case are untethered to Mr. de Hoop Cartier's individual culpability.  They are tethered instead to the total amount of money that flowed through Mr. de Hoop Cartier's unlicensed money transmittal business.  That conduct is a clear violation of law, but one that is akin to a strict liability offense, as running such a business is a federal felony "*whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable*." *See* 18 U.S.C. §1960(b)(1)(A).  Tying Mr. de Hoop Cartier's punishment to the full amount of money transmitted through his account would put him in a

31

similar position to someone who has stolen $470 million, and thus creates an unfair equivalence not related to culpability.

Because Mr. de Hoop Cartier's guidelines range is based on the total amount of money transmitted, regardless of whether it had a lawful or unlawful source, it also creates a distorted picture of his relative culpability as compared to his co-defendants.  Mr. de Hoop Cartier's $470 million in total funds transacted without a license is not comparable to the amount of illegal narcotics proceeds knowingly transmitted by others.

In view of the exaggerated impact of the Guidelines on the PSR and Probation's recommendation, this Court should consider imposing a sentence significantly lower than the resulting guideline range, or even the range recommended by Probation.  As Judge Rakoff explained, "[i]mposing a sentence on a fellow human being is a formidable responsibility," so "a court [must] consider, with great care and sensitivity, a large complex of facts and factors" rather than just focusing on dollar-values involved.  *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).  "As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."  *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006).

In practice, courts have repeatedly varied downward from large guideline sentencing ranges driven by dollar figures.  For example, in *Murgio v. United States*, Judge Failla imposed a sentence of 66 months for the former Coin.mx operator Anthony Murgio, well below the uncontested advisory Guidelines range of 121 to 151 months and below the Presentence Report's recommendation of 96 months, after the Court balanced the facts in that case "with its belief that

the loss figure overstated Mr. Murgio's culpability." *Murgio v. United States*, No. 15 CR. 769-1 (KPF), 2024 WL 4850812, at *4 (S.D.N.Y. Nov. 21, 2024).

Similarly, the estimated "loss" figure here significantly overstates Mr. de Hoop Cartier's conduct when considering the § 3553(a) factors, namely, failing to properly renew expired registration for his crypto business and registering with state authorities, and securing the use of bank accounts by not disclosing they were for his crypto business. Mr. de Hoop Cartier's intent was never to steal from his customers nor from the banks in which his accounts were held. Mr. de Hoop Cartier was trying to build a business, in a challenging environment where the regulations and laws were still in the process of being written, as is evidenced by the ongoing debate over the Clarity Act (*see* fn 17). The Court can and should disregard the guideline sentencing range and impose an individualized sentence based on the particular facts and circumstances of this case.

> 4.  Mr. de Hoop Cartier Has Already Experienced Serious Consequences and Is Remorseful

February 2026 marks two years of continuous incarceration for Mr. de Hoop Cartier, the vast majority (22 months) of which has been at the Metropolitan Detention Center (MDC) in Brooklyn. When evaluating what punishment is appropriate for Mr. de Hoop Cartier in light of his offenses, this Court should consider the conditions at the MDC.

Under Second Circuit law, "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001). Courts in this district "consistently recognize[] the harsh conditions at the MDC as a significant mitigating factor at sentencing." *United States v. O'Berry*, No. 18 Cr. 277 (PAE), 2024 WL 5244936, at *6 (S.D.N.Y. Dec. 30, 2024). That reflects a broad recognition that the conditions of confinement at MDC are "grueling and unacceptable." *United States v. Marshall*, No. 16 Cr. 702 (PAE), 2024 WL 4785068, at *5 (S.D.N.Y. Nov. 14, 2024). During the very

period that Max has been incarcerated at the MDC, district judges have made express factual findings that inmates at the MDC experience near-constant lockdowns,[20] uncontrolled violence,[21] and other unacceptable living conditions.[22]  These judicial findings are corroborated by news reports: during Mr. de Hoop Cartier's first summer at the MDC (the summer of 2024), Spectrum News NY1 obtained video from inside the facility, showing cockroaches crawling in a meal provided to inmates and a shower stall permeated with black mold.[23]  United States Congressman Dan Goldman, whose district includes the MDC, has urged a formal investigation of the

---

[20] *See United States v. Chavez*, 710 F. Supp. 3d 227, 233 (S.D.N.Y. 2024) ("[I]nmates at the MDC spend an inordinate amount of time on "lockdown" — that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise….As of the date of this Opinion and Order, inmates at the MDC have reportedly been on lockdown for much or all of the last three weeks following an assault on staff, with a maximum of 'two hours outside their cells each day' during a short reprieve."); *United States v. Griffin*, No. 22 Cr. 408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. Jun. 10, 2024) ("[I]t has been well documented that the MDC has an ongoing issue with frequent lockdowns due to violence and the threat of violence, among other concerns…").

[21] *United States v. Colucci*, 743 F. Supp. 3d 452, 2024 WL 3643857, at *5 (E.D.N.Y. Aug. 5, 2024) ("Each of the five months preceding this opinion was marred by instances of catastrophic violence at MDC, including two apparent homicides, two gruesome stabbings and an assault so severe that it resulted in a fractured eye socket for the victim. One knife attack was captured on a surveillance video producing images that are horrifying beyond words.").

[22] *Chavez*, 710 F. Supp. 3d at 235-36 (noting that "the MDC's physical conditions have long been problematic" and detailing, *inter alia*, mold, water damage, and the non-functionality of emergency call buttons); *United States v. Nunez*, No. 23 Cr. 517 (AT), 2024 WL 4504493, at *6 (S.D.N.Y. Oct. 16, 2024) (crediting defendant's account that food served to inmates in April 2024 contained "maggots or weevils").

[23] *See* Courtney Gross, "Exclusive: Inmates decry conditions inside Brooklyn Jail," SPECTRUM NEWS NY1 (June 24, 2024), *available at* https://ny1.com/nyc/allboroughs/ politics/2024/06/24/brooklyn-federal-jail-murder-conditions.

conditions at the facility, stating that prison management have "acknowledged the improvements needed at the facility" but "conditions have only gotten worse."[24]

As noted above, Mr. de Hoop Cartier has experienced these horrific conditions firsthand. He has been extorted for money at knife point; he has personally witnessed multiple fights and stabbings, including one murder; multiple inmates in his unit suffer from untreated mental health conditions that make him feel unsafe at all times.  A prolonged stay at the MDC would be extraordinarily difficult for anyone, but it is difficult to overstate the extent to which life at the MDC has been a total shock to Mr. de Hoop Cartier.  To suffer through and endure daily life at the MDC, where violence abounds and cruelty and harshness permeate, has been a consequence of his actions to which Mr. de Hoop Cartier could never have come close to imagining.  The time that he has spent at the MDC is not the equivalent of the same time served in any other federal correctional facility: it is significantly and qualitatively more punitive.  *See United States v. Santana*, No. 22-cr-368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) (imposing a sentence both below guidelines and below the recommendation of Probation "[g]iven the severe prison conditions that prevail at the MDC (conditions that amount to imposing harsher punishments on prisoners)").  For that reason, the nearly two years that Mr. de Hoop Cartier has spent in the MDC should be sufficient so as to constitute the vast majority of his sentence. Despite these terrible conditions, Mr. de Hoop Cartier has had zero disciplinary issues at the MDC and has been a model inmate, availing himself of every possible opportunity for education and self-improvement.

---

[24] Office of Congressman Dan Goldman, "Congressman Dan Goldman's Statement on Ongoing Issues at the Brooklyn Metropolitan Detention Center" (July 19, 2024), *available at* https://goldman.house.gov/media/press-releases/congressman-dan-goldmans-statement-ongoingissues-brooklyn-metropolitan.

Furthermore, the consequences of this extended period of incarceration for Mr. de Hoop Cartier have been severe – in fact, his entire life has been upended and his dreams put on hold. First, Mr. de Hoop Cartier has had to give up his aspirations for permanent French residency, which France offers to people who have resided there lawfully for a continuous period of five years. Mr. de Hoop Cartier had every intention of applying for this benefit, and, having arrived in early 2020, he was one year away from being able to do so when he was arrested in February 2024. Yet his untimely arrest meant that this clock resets and he does not get any "credit" for having lived in France previously. With his deportation to Argentina pending, no money to his name, and his ability to re-enter France unclear, Mr. de Hoop Cartier has had to essentially abandon his dream of living indefinitely in the place in his adult life that has felt most like home.

Finally, Mr. de Hoop Cartier's experience at the MDC has put into sharp focus the extent to which he finds himself very alone. Mr. de Hoop Cartier has always been a lone ranger – he left his family at a young age and never looked back; he has changed careers frequently; he has not spent more than five or ten consecutive years in one country in adulthood. This, of course, has been his choice, and while it has made for an exciting and full, rich life in many regards – and in many ways, is what Mr. de Hoop Cartier can thank for making him the person he is today (someone who speaks five languages, is cultured, and well-travelled), it has had its downsides as well. Mr. de Hoop Cartier has not maintained deep ties and roots to any one place; he owns no property, and the money he accumulated has been seized by the government; his romantic entanglements over the years ultimately fizzled; he finds himself deeply lonely at the MDC. And now, at 58 years old, he is in the position of essentially having to start over – again, alone, from the bottom up, in a country he made the conscious decision to leave twice, once as a young man, and again a decade ago.

36

For much of his life, Mr. de Hoop Cartier was too focused on his work to have enough time to devote to domestic life.  But the experience of this criminal prosecution and the loneliness he has experienced at the MDC has caused Mr. de Hoop Cartier to deeply reflect on what he wants for his future, and he would like to find companionship and settle down.  Sentencing Mr. de Hoop Cartier to a sentence reflecting a significant downard variance would leave open the door for this to happen and would give him the opportunity to meet and connect with someone who wants the same thing.  Mr. de Hoop Cartier has made mistakes along the way, for which he assumes responsibility, but fundamentally he is a soulful, caring person – a romantic, even, and any extended period of incarceration would not only not serve the ends of justice, it would be personally devastating, much more so for Mr. de Hoop Cartier now at this stage of his life.

5.   <u>Significant Further Prison is Not Necessary to Achieve General or Specific Deterrence in This Case</u>

A sentence reflecting a significant downward variance is sufficient to "protect the public from further crimes of the defendant" and to afford "adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B), (C).  As to protecting the public, Mr. de Hoop Cartier is not at risk of reoffending.  This case is Mr. de Hoop Cartier's first encounter with the criminal justice system.  Before the conduct here, he lived more than five decades as a law-abiding man.

Recidivism data recently analyzed by the Sentencing Commission shows that offenders with zero criminal history points, such as Mr. de Hoop Cartier, have considerably lower recidivism rates than any other offenders.  *See* 2023 Amendments in Brief, U.S.S.C. (2021), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_821.pdf.  Among other findings, the Commission concluded that "zero-point" offenders were less likely to be rearrested than "one point" offenders (27% compared to 42%), the

37

largest variation of any comparison of offenders within the same Criminal History Category.  *Id.*

Mr. de Hoop Cartier a zero-point offender, is not at risk of reoffending.

Mr. de Hoop Cartier is also unlikely to recidivate because he is 58 years old.  Recidivism

rates decline relatively consistently as age increases.  United States Sentencing Commission,

*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*,

at 12 (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-

publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf; *U.S. v.*

*Hodges*, No. 07-cr-706 (CPS), 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) ("[P]ost-*Booker*,

courts have observed that recidivism is markedly lower for older defendants.").  The Sentencing

Commission has stated that the recidivism rate for Category 1 defendants over the age of 50 is 6.2

percent. *See* United States Sentencing Commission, at 28.

Moreover, and perhaps more importantly, Mr. de Hoop Cartier cannot and will not engage

in the same conduct that led to his conviction.  These proceedings have opened Mr. de Hoop

Cartier's eyes to the risks of transacting in cryptocurrency—risks he is not willing to take now

that he knows the consequences.  It will be exceedingly difficult for Mr. de Hoop Cartier, who is

unlikely to be able to return to the United States following his deportation, if ever, and as a

convicted felon, he will be unable to open a business banking account with most major U.S.

banks.  Instead, following his release and deportation, as previously noted, Mr. de Hoop Cartier

plans to return to his singing career and produce the album that he had nearly completed at the

time of his arrest.  A sentence of reflecting a significant downward variance after two years of

harsh incarceration is enough to protect the public.  18 U.S.C. § 3553(a)(2)(B), (C).

Further incarceration is also unnecessary to promote general deterrence.  As courts in this

District and beyond have recognized, recent studies have questioned the existence of a link

between severity of punishment and general deterrence. *See United States v. Gallego*, No. 95-CR-0284 (LAK), 2025 WL 723237, at *5 n.42 (S.D.N.Y. Mar. 6, 2025) (citing Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, 42 Crime & Justice 199 (2013)); *see also United States v. McCarthy*, No. 22-cr-491, 2023 WL 3741996, at *3 & n.1 (E.D.N.Y. May 30, 2023). The National Institute of Justice, an agency of the DOJ, has stated that "sending an individual convicted of a crime to prison isn't a very effective way to deter crime." *National Institute of Justice, Five Things About Deterrence* (June 5, 2016), *available at* https://nij.ojp.gov/topics/articles/five-things-about-deterrence#one. Rather, "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment." *Id.*

Mr. de Hoop Cartier's prosecution and guilty plea, combined with the severe consequences already imposed, thus have achieved an adequate deterrent effect. He now carries the stigma of being a felon and will for the rest of his life. These circumstances are adequate punishment. *Cf. United States v. Mateo*, 299 F. Supp. 2d 201, 209–10 (S.D.N.Y. 2004) ("[T]here is more to the concept of just punishment and deterrence of the particular individual than" prison time, including "losses of . . . socioeconomic status, of employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement.").

6. A Sentence Reflecting a Significant Downward Variance Would be Sufficient Punishment for Mr. de Hoop Cartier; the Alternative Would be Greater Than Necessary to Fulfill the Aims of Punishment

The nearly two years that Max has spent incarcerated at the MDC are more than enough to fulfill the purposes of sentencing. As noted above, Mr. de Hoop Cartier has suffered greatly at the MDC. Mr. de Hoop Cartier has been subject to frequent acts of violence, extortion, and lockdowns, despicable living conditions, and lack of access to basic services and necessities, such

as drinking water and basic medical care.  For example, on July 17, 2024, only two months after his arrival at the MDC, Mr. de Hoop Cartier personally witnessed one inmate murder another by stabbing him to death.  This situation led to a lockdown of 21 consecutive days, during which inmates were allowed only ten minutes to shower every four days.  He has had trouble sleeping since.

This Court should sentence Mr. de Hoop Cartier to a sentence reflecting a significant downward variance for the additional reason that he is a foreign national and, as a result, will likely spend more time in custody and under harsher conditions than would a similarly situated white collar offender who is a U.S. citizen.  Whereas a U.S. citizen convicted of Mr. de Hoop Cartier's crimes would ordinarily be designated to serve his sentence in a minimum-security prison camp, Mr. de Hoop Cartier will be deemed a "Deportable Alien" and be ineligible for a camp.  *See Inmate Security Designation and Custody Classification*, Ch. 5 at 9, 12, U.S. Bureau of Prisons (Sept. 4, 2019), *available at* https://www.bop.gov/policy/progstat/5100 008cn.pdf.  As a result, Mr. de Hoop Cartier faces placement in "at least a Low security level institution," *id.*, where he will experience worse prison conditions than at a camp.    And in contrast to camps, which house inmates serving sentences of ten years or less with no history of violence, low-security facilities include prisoners serving sentences between 10 and 20 years, many of whom have prior records involving a gun or violent offense, including individuals with gang affiliation. It is no surprise that low-security prisons have higher rates of violence than camps.  *See Federal Prisoner Statistics Collected Under the First Step Act, 2022* at Table 4, DOJ Bureau of Justice Statistics (Dec. 2022), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/fpscfsa22.pdf.

Further, Mr. de Hoop Cartier likely will not be released from custody when he completes his term of imprisonment. Instead, he will be transferred to Immigrations and Customs Enforcement to be held for an indeterminate time (none of which will be credited against his federal sentence) until he is removed to Argentina. Even if Mr. de Hoop Cartier waives his right to a judicial removal proceeding, the deportation process is slow and unpredictable. The prospect of post-sentence detention by ICE thus warrants minimizing Mr. de Hoop Cartier's custodial sentence. *See United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014) ("In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family.").

## III.    THE COURT SHOULD NOT IMPOSE A FINE

As the PSR report has already determined, Mr. de Hoop Cartier does not have the ability to pay a fine, as he has no financial assets. Accordingly, the Court should decline to impose a fine, as doing so would be both futile and punitive.

### CONCLUSION

For the reasons stated above, we respectfully request that the Court sentence Mr. de Hoop Cartier reflecting a significant downward variance.

Dated:       April 9, 2026
             New York, New York

                                      MORVILLO ABRAMOWITZ GRAND IASON
                                         & ANELLO P.C.

                                      By:    /s/ Kathleen E. Cassidy
                                             Kathleen E. Cassidy
                                             Katri Stanley
                                             Chloe Lewis
                                             Kayasha Lyons
                                             565 Fifth Avenue
                                             New York, New York 10017
                                             (212) 856-9600
                                             kcassidy@maglaw.com

                                      *Attorneys for Defendant Maximilien de Hoop Cartier*

42